HELEN GOLDTHWAITE
*vs.*
SHERATON RESTAURANT
AND
UTICA MUTUAL INSURANCE CO.

Androscoggin. Opinion, October 20, 1958.

*Berman & Berman,* for plaintiffff.

*Verrill, Dana, Walker,*
*Philbrick & Whitehouse,*
*John A. Mitchell,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

WEBBER, J. This was an appeal from a *pro forma* decree of the Superior Court implementing a decision of the Industrial Accident Commission. It is not disputed that on June 1, 1956 the petitioner, while at work, fell the length of the cellar stairs in her employer's place of business. Prior to the accident she had apparently enjoyed good health and had regularly performed hard physical work. The immediate noticeable effects of the fall were slight but she experienced pain in her lower back and on June 7th, at the request of her employer, consulted her physician, Dr. Haas. Although she continued work for some time, her condition steadily deteriorated until she was forced to cease work altogether on September 1st. Although an accurate diagnosis was not at first possible on the basis of the symptoms manifested, it has now been determined that the petitioner is suffering from progressive muscular atrophy, a disease the exact cause of and cure for which remain unknown.

The evidence presented a marked conflict in medical testimony. Dr. Haas, an experienced general practitioner, felt that he could express an opinion "within reasonable medical

certainty" that a trauma causing a general concussion of the whole spine could damage the motor neuron cells and produce atrophy of the muscles. It was his opinion that all the symptoms noted, and especially the complete change in health which occurred shortly after her fall, were consistent with the view that petitioner's disability was caused by the accident.

On the other hand, Dr. Bidwell, a qualified neurosurgeon, stated very positively that trauma could never cause nor accelerate progressive muscular atrophy. It was his opinion that it was a mere coincidence that the first symptoms of muscular atrophy appeared shortly after the accident. In substance this was also the opinion of Dr. John P. Greene, an orthopedic surgeon, whose written report was received in evidence in lieu of his oral testimony.

During the *direct* examination of Dr. Bidwell, the following questions and answers were received:

"Q. Doctor, you say that physical trauma has been discarded as a possible causative factor of this disease?

A. That is correct.

Q. Do you have any medical authority for that answer?

A. I do. The three-volume textbook of neurology, Kinnier Wilson, edited by Bruce, has for a good many years stood as the recognized reference textbook of neuro-medical diseases. Its most recent issue is, I believe, less than two years old and there is no other book in the field of neurology that can stand in such relationship to the field as does Kinnier Wilson."

After some colloquy, counsel entered into the following stipulation:

"The Commissioner: It is agreed and stipulated that attorneys for both parties will submit to the

> Commission quotations or abstracts from certain medical textbooks and authorities which before submission to the Commission will have the approval of each attorney."

Without objection, both counsel by examination pursued the matter of medical authority at great length. The opinion of the witness was solicited on cross examination as to whether certain writers of medical textbooks are recognized authorities in their field. On redirect examination the witness was permitted to criticise certain of these medical treatises as unrevised or elementary. At the close of the hearing, pursuant to their stipulation, counsel filed certain abstracts from medical treatises, not one of which professed to rule out trauma as a precipitating or accelerating cause of muscular atrophy. On the contrary, several of the authorities recognized trauma as a probable accelerating cause. Kinnier Wilson, specifically relied upon by Dr. Bidwell, stated: "Trauma is not always perhaps to be lightly dismissed." This statement was followed by a discussion of some of the evidence suggesting that trauma may in some instances be a precipitant.

In an exhaustive opinion, the Commissioner, after carefully and accurately analyzing all the evidence, concluded that the petitioner's disability was so related to the accident as to be fully compensable. In reaching this result, the Commissioner gave weight to (1) the excellent health of the petitioner up to the time of her fall, (2) the rapid onset of symptoms of muscular atrophy after the accident and the steady deterioration of her condition thereafter, (3) the medical opinion of Dr. Haas, and (4) the medical authorities submitted by counsel which tended to support the opinion of Dr. Haas and to contradict in part the opinion of Dr. Bidwell. The respondent contends that the opinion of Dr. Haas was at best conjectural and that in adopting it, the Commission has based a decision on speculation and

guesswork. The respondent also asserts that the medical treatises were hearsay evidence and entitled to no weight whatever. In short, the respondent maintains that there was no legally competent evidence to support the decision.

If the accidental fall suffered by the petitioner "lighted up," accelerated or precipitated the disabling effects of a disease hitherto quiescent, the resulting disability was compensable. *Eleanora Gagnon's Case,* 144 Me. 131. As was said in *Mailman's Case,* 118 Me. 172 at 179: "It is sufficient, however (assuming other elements proved), if by weakening resistance or otherwise an accident so influences the progress of an existing disease as to cause death or disablement."

Does the decision here rest upon something more substantial than mere conjecture and speculation? We think that it does. The nature and severity of the accidental fall are not disputed. That painful injuries to the back resulted which required medical attention is not questioned. The marked change in the petitioner's health commencing shortly after the accident is some evidence of accidental causation of the later disability. *Mamie Taylor's Case,* 127 Me. 207, 212; *Larrabee's Case,* 120 Me. 242; *Ballou's Case,* 121 Me. 283; although it would not suffice if it were the *only* evidence, *Shaw's Case,* 126 Me. 572. The opinion of a qualified medical expert that the injuries accidentally inflicted could and did produce the aggravated manifestations of the symptoms of muscular atrophy, even though disputed by other medical experts, was competent legal evidence to be considered by the Commission. In *Mamie Taylor's Case,* *supra,* the decedent employee engaged in some heavy lifting such as might induce strain. However, he made no complaint and there was no other indication of accident at the time of the occurrence. Shortly after, however, he began to suffer pain in the chest and shortness of breath. About ten days later he suddenly died. The attending physician

gave it as his opinion that it was probable that the decedent died of pulmonary embolism and that lifting was a material factor in producing it. A finding by the Commission that there was some causal connection between the heavy lifting and the death was deemed to have the support of competent evidence and reasonable and rational inferences drawn therefrom. We are satisfied that in the instant case the decree is supported by competent evidence and satisfies the rule that "it may be slender but it must be evidence, not speculation, surmise, or conjecture." *Mamie Taylor's Case,* *supra,* at page 208.

We turn now to consideration of the abstracts from medical treatises which were admitted by stipulation and agreement and which influenced to some extent the result reached by the Commission. These obviously constituted hearsay evidence and were subject to the rules of law imposing limitation on the use thereof.

"The general rule, supported by many cases and recognized apparently in all states in which the question has arisen, except in Alabama, is that medical books or treatises are not admissible to prove the truth of the statements therein contained. (The rule assumes that the books or treatises are properly identified and authenticated, and applies notwithstanding the fact that it is shown that they are recognized as standard authorities on the subject to which they relate)." 65 A. L. R. 1102; 20 Am. Jur. 816, Sec. 968. It appears to be quite generally held that when a medical expert assumes to base his opinion, partly at least, on authorities and not exclusively on his own experience, he may be cross examined with respect to the authorities for the purpose of disparaging or discrediting his testimony. Courts, however, hold very divergent views as to the right to resort to medical authority on cross examination in the instances when the expert does not base his opinion even in part upon the authorities. Anno. 82 A. L. R. 440; *Reilly* v.

*Pinkus* (1949), 338 U. S. 269, 70 S. Ct. 110; *Dolcin Corp.* v. *Fed. Trade Com.* (1954), 219 F. (2nd) 742. In determining what course was open to the Commission in the instant case, it is interesting to note that Dr. Bidwell, on *direct* examination made reference to Kinnier Wilson as a recognized authority supporting his opinion. It was thereafter, open to counsel for petitioner to make proper use of recognized medical authorities for the limited purpose of impeachment of the medical witness. The respondent concedes all this but insists that the Commission failed to limit its use of the evidence to impeachment but rather gave weight to it as evidence of the truth of the matter asserted. The stipulation under which the evidence was admitted, however, contained no limitation upon the use or purpose for which the evidence might be considered.

Our own court has had few occasions to consider the subject of medical treatises. In *Ware* v. *Ware,* 8 Me. 42, 56, the medical texts were offered and excluded. It was contended that the exclusion was error. The court held that the texts were properly excluded as hearsay which lacked the sanction of an oath and precluded the opportunity for cross examination. However, the court recognized that such evidence may by proper means enter the case for consideration by the fact finder. At page 56, the court said: "They (the medical treatises) do not come into court, as all other evidence must, either *by consent* or under the sanction of an oath. Without *such consent* or sanction, their contents are mere declarations and hearsay." (Emphasis supplied)

In *Shaw's Case, supra,* the Commission resorted to medical texts which were not made part of the evidence or the record. The court was properly critical of the Commission for medical theorizing outside the evidence, but had no occasion to pass on questions either of admissibility or weight with reference to medical treatises. By way of dictum, however, the court called attention to the rule applicable in this

jurisdiction that "medical books (are) incompetent as evidence of any statement they contain." The court was then speaking with reference to admissibility rather than weight.

We conclude that the applicable rule in Maine forbids the admission of learned medical treatises over objection except when offered to impeach a medical witness who relies at least in part upon medical authority for the opinion he has expressed; but such evidence may nevertheless be properly received by consent. It has frequently been held by our court that when evidence is admitted without objection and no motion is made to strike it from the record, it becomes what has been designated as "consent evidence." *Moore v. Protection Ins. Co.,* 29 Me. 97; *Brown v. Moran,* 42 Me. 44; *Tomlinson v. Clement Bros.,* 130 Me. 189.

This brings us to a consideration of the weight which may be given to medical treatises admitted by consent and without limitation as to purpose. In this connection courts have expressed very divergent views. "Applying these general principles, most courts hold that hearsay evidence, where admitted without objection, may properly be considered and given its natural and logical probative effect, as if it were in law competent evidence." 20 Am. Jur. 1036, Sec. 1185. "While some authorities have held differently as to evidence admitted without objection, a number hold that incompetent evidence should be given no probative force and that the admission of such evidence cannot raise an issue or form the basis of a verdict, finding, or judgment." 32 C. J. S. 1077, Sec. 1034. Supporting the view that hearsay admitted by consent should be given weight are such authorities as *Mahoney v. Harley Private Hospital,* 279 Mass. 96, 180 N. E. 723; *Barlow v. Verrill,* 88 N. H. 25, 183 A. 857; *Derrick v. Bd. of Liquor Control,* 98 Ohio App. 97, 128 N. E. (2nd) 239, 241; *In Re Fagin's Est.,* 246 Iowa 496, 66 N. W. (2nd) 920. Some courts, while permitting some weight to be given such evidence, have taken the op-

portunity to warn of the "inherent weakness" of hearsay. "In such circumstances, it is a rule of law that such evidence has some probative value and may be considered along with the other testimony in the case. * * * But hearsay testimony so admitted (without objection) in evidence must be weighed with caution and in the light of its inherent weakness." *Shepard* v. *Purvine,* 196 Ore. 348, 248 P. (2nd) 352, 363. Because of this "inherent weakness," it could not be given "unwarranted and controlling effect on (a) vital issue." *Danahy* v. *Cuneo,* 130 Conn. 213, 33 A. (2nd) 132, 134. In some instances courts have taken the position that such evidence amounts to no more than a "scintilla" which will not substitute for substantial evidence. *United States* v. *Krumsiek* (1940), 111 F. (2nd) 74, 78 (citing *Edison Co.* v. *Labor Board,* 305 U. S. 197, 229, 59 S. Ct. 206, 217). 104 A. L. R. 1130 contains a covering annotation.

At least as pertains to *oral* hearsay, our court has heretofore referred to such evidence as having "no probative force." In *Shaw* v. *McKenzie,* 131 Me. 248, 250, a case in which a plaintiff's witness related statements allegedly made by the defendant which were hearsay, the court first pointed out that the statements could not qualify as admissions because defendant did not speak of his own knowledge; and then with reference to the weight to be given to such hearsay, the court said: "Since this evidence was admitted without objection and no motion was made to strike it from the record, it becomes what has been designated in some of our decisions as consent evidence. * * * But it is only to be given the weight to which it is entitled and must be weighed according to the rules established by law. * * * Hearsay evidence has *no probative force* and will not sustain a verdict lacking other support. * * * The admission of such evidence without objection does not add any weight to it if intrinsically it had none and should have been excluded upon objection." (Emphasis supplied). And in the recent case of

*Burgess* v. *Small* (1955), 151 Me. 271, 273, where there was an absence of direct or circumstantial evidence to prove identification of property in trover, but some oral hearsay was admitted without objection, we said: "A great deal of hearsay testimony was injected into the case which cannot be accorded any probative force in this analysis of the sufficiency of the plaintiff's evidence."

So also as to industrial accident claims. In *Mailman's Case, supra,* at page 176, the court said: "The commissioner permitted witnesses to rehearse the story of the accident as told by the deceased. This was hearsay testimony, plainly inadmissible. But the allowance of hearsay evidence by the commissioner does not require this court to reverse his decree *unless such decree was in whole, or in part, based upon such incompetent testimony.* * * * Were the court convinced that hearsay influenced the decree it would be required to sustain the appeal. We perceive, however, no sufficient reason for questioning the commissioner's statement that he made his finding of fact 'wholly disregarding the hearsay evidence.' " (Emphasis supplied.) The opinion does not make it clear whether the hearsay was admitted by consent or through error. In *Larrabee's Case, supra,* the Commissioner was silent as to whether or not he had based his findings in any part upon the oral hearsay which became part of the evidence. In this connection the court said at page 244: "In the last case *(Mailman's Case, supra),* the commissioner expressly stated he did not base his findings in any part on the incompetent testimony; but if no such statement is made in the findings of the commissioner, we do not think in this class of cases it is to be presumed that prejudice resulted from the receipt of inadmissible testimony, if there is sufficient competent evidence in the case on which his findings may rest." In the instant case the commissioner indicated that he *did* rest his findings in part upon the contents of the abstracts from learned medical treatises.

Now that we have had occasion to review the authorities with some care, we are satisfied that unqualified statements that hearsay evidence admitted by consent has "no probative force" do not accurately reflect what seems to be the better reasoned rule of law. In order to clarify the subject for the future in this jurisdiction, it may now be stated that such evidence may properly be considered and given its natural and logical probative effect. The factfinder must always, however, weigh such evidence with caution, mindful of its inherent weakness, the same weakness which leads to exclusion upon objection. It may properly be said that such evidence may properly be given weight as *corroborative* of other competent legal evidence, but will not *alone* support a verdict or finding.

Reverting once more to prior cases in which this court has employed the phrase "no probative force," we are convinced that the results in those cases would not have been otherwise if the rule had been recognized as we now state it. For example, in *Burgess* v. *Small, supra,* the hearsay evidence which crept into the case could not have been permitted to suffice as the *sole* support of a verdict. So also in *Shaw* v. *McKenzie, supra,* the court noted that the hearsay evidence was the *only* evidence proffered.

Without doubt, written hearsay tends usually to carry more conviction to the mind of the objective factfinder than does oral hearsay. The writing itself eliminates the necessity for dependence upon what may be the faulty memory of the relating witness. When oral hearsay is involved, even a witness who has no intention to mis-state the truth may nevertheless offer an incorrect or garbled or incomplete version of the statements of the absent third party. The writing, itself present in court, substitutes for the memory of the relating witness. Thus the hearsay becomes somewhat more trustworthy. A fortiori, when we are dealing with the written opinions and experiences of a recognized au-

thority in the medical field who has no motive for falsification, who is bound by the ethics of his profession and who is writing for the critical eye of other medical men, those opinions and experiences will often have very real and practical evidentiary value. There is obviously a great difference between the intrinsic probative worth of such evidence and that of oral hearsay of the type usually encountered in the trial of cases which ordinarily rises little if any higher than the level of gossip and rumor. The weight to be given to the learned medical treatise may of course be diminished, as the weight of any expert opinion may be, by a showing that the material is outdated, or disproved by later research, or contradicted by other reputable authority. The weakness of such evidence lies in the fact that the author is not present in court to be cross-examined and it cannot be known with certainty that his opinions, if tested by cross-examination, would prove now to be the same as those he expressed in former writings. The science of medicine is not exact and knowledge in the medical world changes from day to day.

It may be noted in passing that a mere stipulation into evidence of abstracts from medical treatises, as in the case before us, does not eliminate therefrom their hearsay characteristics. Such a stipulation does not express or imply an agreement that the medical writer, if present in court, would now assert without change or qualification that which appeared in his treatise. When, however, the stipulation is in more inclusive form and asserts that an absent witness, if present, would state certain specified facts and opinions, the hearsay characteristics are thereby removed and the parties are understood as agreeing that such would be the net effect of his testimony under oath and after cross-examination. The contents of such stipulations become competent legal evidence and stand on the same footing as the sworn testimony of witnesses present in court. It is ap-

parent therefore that the wording of stipulations where either absent witnesses or abstracts from learned treatises are concerned may well be important and even controlling.

Applying these rules to the case before us, we hold that even though these medical abstracts in the form in which they entered the case retained their hearsay characteristics, the commissioner committed no error in giving them *corroborative* weight. They tended to support the medical opinion of Dr. Haas which, taken with other legal evidence in the case, justified the ultimate finding that trauma "lighted up" and accelerated the disabling effects of muscular atrophy.

The entry will be

> *Appeal denied.*
> *Decree affirmed.*
> *Allowance of $250 ordered to petitioner for expenses on appeal.*