## A. J. MICHAUD

v.

## VAHLSING, INC.

Supreme Judicial Court of Maine.

April 24, 1970.

Rudolph T. Pelletier, Madawaska, for plaintiff.

George J. Mitchell, Portland, William R. Flora, Presque Isle, for defendant.

Before WILLIAMSON, C. J., and WEBBER, MARDEN, DUFRESNE, WEATHERBEE, and POMEROY, JJ.

WEATHERBEE, Justice.

The Plaintiff is a potato grower in Grand Isle, Aroostook County, and had for several years sold to the Defendant, a processor in Easton, large quantities of potatoes grown by himself and others. The controversy concerns payment for a disputed quantity of potatoes shipped by Plaintiff to Defendant between June 6 and June 14, 1963. An Aroostook County jury returned a verdict for the Plaintiff from which Defendant appealed. We conclude that the appeal should be denied.

The jury could properly have found as follows:

During the period in issue the parties followed generally the business procedures which had characterized their dealings in previous years. In the summer of 1962 Plaintiff contracted to deliver to Defendant 50,000 barrels of potatoes of acceptable quality to be delivered at Defendant's plant in Easton in specified monthly deliveries between November 1962 and June 1963 at graduated monthly prices, the price for the last month's deliveries (the ones in issue) being $2.80 per barrel for U. S. 1s and 2s. No dispute now exists as to the deliveries before June 6, 1963 and payment was made for them. Between that date and June 14 the Plaintiff loaded and shipped nineteen carloads to Defendant and the potatoes were received by Defendant at dates between June 8 and June 21. The nineteen carloads form the subject of this action.

The practice previously followed by the parties had been that after their arrival in Easton, Defendant unloaded and weighed the potatoes converting the total weight for each car to a barrel count for the carload reflecting the grades involved. One of Defendant's employees recorded the barrel count on what was called a receiving slip and signed the slip. The receiving slips went in multiple form to the office from which a copy was mailed to the Plaintiff, usually within a week. From Defendant's copy of the receiving slip a voucher was prepared which recorded the barrel count of the separate grades in the car and added the calculation by Defendant which determined the sum Plaintiff was to be paid for the carload. At various intervals checks were sent to Plaintiff representing payments for the loads covered by the voucher or vouchers accompanying the check. In the meantime, following the arrival of the car in Easton, Plaintiff received a bill of lading from the railroad containing the car number, description of contents, date of delivery and a statement of weight of contents which was a standard round figure on which the flat freight charge for carload quantities had been based and which was considerably below the actual capacity of the car. The bill of lading was receipted by one of Defendant's employees on arrival. Plaintiff had made no attempt to weigh or otherwise measure the potatoes when they were being loaded and had always relied for his payment upon the barrel count made by Defendant at unloading. In the case of loads contained in bulk cars, Defendant had arrived at the barrel count by weighing the potatoes as they were unloaded and by converting the weight to barrels by the formula of 165 pounds equals 1 barrel.

During the times of arrival of these nineteen cars, Defendant's plant was engaged in processing a large order of southern onions and Defendant found it expedient to complete the onion contract before Plaintiff's potatoes were handled. As a result, as Plaintiff's cars arrived they were left standing in Defendant's yard, loaded, in hot weather for periods ranging from a few days to more than three weeks and parts of their cargoes spoiled and were dumped by Defendant.

The first two cars to arrive were unloaded June 20. It was found that 133 barrels from one car and 91 barrels from the other were spoiled and they were dumped by Defendant. The receiving slip

and vouchers which Plaintiff eventually received for these two cars showed the amounts accepted and the amounts which were rejected as spoiled. (Plaintiff does not question these figures.) After that Defendant made no record of the quantities which were rejected and dumped.

On June 29 or 30, not having gotten his receiving slips with the usual promptness, Plaintiff phoned Defendant's plant and learned that substantial quantities of his potatoes were decomposing as they sat in cars in Defendant's yard. As Defendant proceeded to unload the cars the spoiled and unusable potatoes were rejected by Defendant and abandoned without having been weighed and the usable ones were accepted and weighed and payment for them was eventually sent to Plaintiff.

Thus the last seventeen receiving slips sent to Plaintiff by Defendant represent only the usable potatoes. There is no dispute as to the quantities of usable potatoes as shown on the receiving slips or that Plaintiff has received payment for them.

The issues in Superior Court concerned the Plaintiff's claim that he was entitled to payment for the unrecorded quantities which were rejected, having decomposed while sitting in Defendant's yard (the responsibility for which Defendant denied) and Defendant's counterclaim for damages for Plaintiff's alleged failure to make deliveries as agreed during the next two seasons.

The jury rejected Defendant's counterclaim and awarded Plaintiff damages in the amount of $10,000.00. Defendant appeals only from the judgment against it in Plaintiff's action and argues here that 1) there was insufficient evidence of the total quantity of potatoes shipped by Plaintiff to Defendant to support the verdict for Plaintiff, and 2) the parties had arrived at an accord and satisfaction as a matter of law.

We will consider first Defendant's contention as to accord and satisfaction. Defendant argues that during the eight years of dealings between Plaintiff and Defendant the Defendant's check had been given and received as payment in full for the transactions represented by the attached vouchers, and that substantially the same procedure was followed here and that it constituted an accord and satisfaction. The principles of the theory of accord and satisfaction have frequently been stated by our Court. An accord and satisfaction occurs when there is a tender on the part of the debtor in satisfaction of a particular demand and the creditor accepts it as such. Farina v. The Sheridan Corporation, 155 Me. 234, 153 A.2d 607 (1959). If there is a question of fact as to the intention of the parties the decision is properly for the jury but if on the evidence no such question exists and only one inference or finding can be made, there is an accord and satisfaction as a matter of law. Wiggin v. Sanborn, 161 Me. 175, 210 A.2d 38 (1965). By statute then applicable, no action could be "maintained on a demand settled by a creditor * * * in full discharge thereof, by the receipt of money or other valuable consideration, however small". R.S.1954, chap. 113, sec. 64.

Under this statute, as under the common law, it must be shown that the debtor tendered the amount in satisfaction of the particular demand and that the creditor accepted it as such. Fuller v. Smith, 107 Me. 161, 77 A. 706 (1910).

The evidence bearing on this issue can fairly be summarized as follows: Plaintiff had shipped the last of the nineteen cars June 14. On June 29 or 30 Plaintiff first learned that serious spoilage was occurring in the cars when he phoned Alfred Litz, Defendant's General Manager, to inquire why the receiving slips hadn't been sent him. Plaintiff got the receiving slips during the first week of July. He accepted as true and accurate Defendant's count of the potatoes Defendant was able to use but he then phoned Mr. Litz and expressed his dissatisfaction with the Defendant's apparent intention not to pay him for the ones which had spoiled. He told Mr. Litz he

intended to file a claim for the balance which he considered due him as soon as he could get his records together. Several weeks later Defendant sent Plaintiff vouchers for the nineteen carloads with Defendant's checks in amounts equal to the contract prices for the quantities which the vouchers showed to have been accepted. Plaintiff deposited the checks in his bank accounts and they were paid. He testified that he did not accept the checks in full settlement. He then went to Easton and presented Mr. Litz with records which he had compiled in an effort to demonstrate the quantity of spoiled potatoes (not included in Defendant's vouchers) for which he contended he was entitled to be paid. Mr. Litz examined Plaintiff's claim and said he thought it was reasonable but that the company was unable to pay it at that time. During that fall and the next winter Plaintiff and Mr. Litz discussed Plaintiff's claim several times, usually concerning plans for Defendant to pay by adding 25 cents a barrel to the price Plaintiff would have received on the next year's contract. In the spring of 1964 Mr. Litz said he thought he could pay Plaintiff in one lump sum and asked Plaintiff to send him another copy of his claim. Twelve days later Mr. Litz died without payment having been made. The following winter Mr. Litz's successor finally rejected plaintiff's claim.

■ This testimony presented a jury question as to whether the checks were paid by Defendant and accepted by Plaintiff in full satisfaction. The jury found they were not.

We must now examine the remaining issue as to whether the evidence as to the quantity of potatoes shipped by Plaintiff and rejected by Defendant as spoiled was sufficient to support the jury's award of $10,000.00 to Plaintiff, bearing in mind that the jury's determination that Defendant was responsible for the spoilage of the potatoes it did not accept is not questioned in this appeal.

When trial was had in 1967 Plaintiff was unable to produce any records from which the exact quantity of potatoes shipped to Defendant could be determined. He explains this by stating that his dealings with Defendant's manager, Mr. Litz, during several years had given him a complete confidence in the barrel count made by Defendant when the cars were unloaded and that he had not felt it necessary to record the exact quantities in the carloads as they were shipped. He had relied upon Defendant's count on these cars, as he had done on other occasions. His difficulty here, he says, results from Defendant's unforeseen failure to count the barrels of spoiled potatoes from the last seventeen cars which were hauled away as waste.

Lacking such a count, Plaintiff strained to reconstruct the total quantities in the nineteen cars by these methods:

1) He had evidence of the quantities in seven cars.

   a) Defendant had weighed the rejected portions from the first two cars and the vouchers show loads of 452 and 460 barrels of which 133 and 91 barrels were rejected and not paid for.

   b) He testified that his hired men reported filling four cars with 424, 366, 689 and 484 barrels but Defendant's vouchers recorded only 272, 273, 321 and 302 as usable.

   c) One car was a "mixed car" made up of potatoes which Plaintiff had bought from two different farmers. Plaintiff testified that *their* records (from which he had paid them) showed a total of 438 barrels—91 more than Defendant's voucher had reported.

2) He knew from personal knowledge that eight other cars were full when shipped and that Defendant had paid him for less than their capacities.

a) One car was filled with potatoes from his own farm and in another his potatoes made up half the load. In both cases he knew from his own knowledge that both were filled but the amount for which he was paid constituted only a small part of their capacity.

b) Plaintiff also testified that he had personal knowledge that a car from Clifford Gendreau's lot, one from Frank Saucier's lot and two from Frank Faucher's lot were full when loaded although he had been paid by Defendant for less than capacity loads.

c) Plaintiff filled two cars with potatoes purchased from Benoit Chasse and while he had not measured the quantities loaded, he knew both were filled to capacity —considerably greater quantities than those for which Defendant had paid Plaintiff—because after loading was completed Mr. Chasse had a truckload left over which he had been unable to get into the cars.

3) Plaintiff presented as exhibits the bills of lading for the nineteen cars in question, which listed the weight contained in each car. While this weight represented a flat rate which the Railroad gave the farmers for carload lots and did not indicate a precise quantity (for example, the bills of lading for the two bulk cars the spoiled portions of which Defendant did measure listed their weights as 68,000 pounds or 412 barrels but Defendant's own vouchers admit weights of 452 and 460 barrels), Plaintiff argues that they are significant in two respects.

a) All the "flat weights" listed on the bills of lading are in excess of the quantities found on Defendant's vouchers and at least half of them are greatly in excess. These bills of lading were receipted by Defendant's employees who, he says, would not be expected to receipt for loads obviously smaller than the quantities stated on the bills of lading.

b) He contends that while the bills of lading demonstrate that large quantities of potatoes were shipped above the quantities shown on Defendant's vouchers, the quantities were actually much higher than that because it was Plaintiff's practice to load all cars to their *full* capacity to get a "free ride * * * to Easton" for as many barrels as possible.

4) Plaintiff testified without objection that during the previous month he had shipped to Defendant nineteen carloads and that those nineteen carloads contained 3,882 barrels more that the *accepted* contents of the nineteen cars in question.

5) Plaintiff testified that from the information he had available he prepared a statement showing the shipments he had made to Defendant, their sources, their dates and the number of barrels he contended they contained. He testified that (as mentioned during discussion of the previous issue) he took this statement to Mr. Litz who, in effect, agreed that Plaintiff's statement was substantially correct and agreed to pay on the basis of the statement.

Before evaluating this evidence we are required to consider several rules of evidence concerning its effect.

A large number of exhibits were offered by both sides and admitted by mutual consent. Plaintiff's 39 and 40, copies of which were presented to Mr. Litz, contain many of the factors from which Plaintiff arrived at his conclusions as to the total quantity contained in the nineteen cars. Plaintiff's contention that Defendant's ac-

tion in agreeing to the admission of Plaintiff's 39 and 40 constituted an admission that the figures contained thereon are correct statements as to the quantities contained in each car cannot be supported. The acceptance of the documents as exhibits merely presented them for the jury's determination as to the evidentiary value of the figures shown on them. Defendant did not, by agreeing to the admission of the exhibits, concede Plaintiff's entire claims.

The fact that the record does not disclose the capacities of the next previous nineteen cars makes comparison with the loads of the nineteen in issue of dubious value if undertaken by the jury or by us. However, this comparison was a part of the basis of the statement which Plaintiff presented to Mr. Litz and which Defendant's General Manager, with presumably superior knowledge as to the capacities of the types of cars involved, found to be reasonable. We cannot say that this testimony, when viewed in that light, was devoid of probative force.

A substantial part of Plaintiff's evidence as to quantity above that paid for by Defendant rests upon hearsay evidence. Plaintiff was permitted to testify without objection to quantities on the basis of information given him by his own employees who loaded cars and by farmers whose potatoes Plaintiff purchased for resale to Defendant. Hearsay evidence which could have been excluded if objected to but was instead admitted without objection is known as "consent evidence". Our position as to the weight that can be given to consent evidence was stated in Goldthwaite v. Sheraton Restaurant et al., 154 Me. 214, 145 A.2d 362 (1958).

"Now that we have had occasion to review the authorities with some care, we are satisfied that unqualified statements that hearsay evidence admitted by consent has 'no probative force' do not accurately reflect what seems to be the better reasoned rule of law. In order to clarify the subject for the future in this jurisdiction, it may now be stated that such evidence may properly be considered and given its natural and logical probative effect. The factfinder must always, however, weigh such evidence with caution, mindful of its inherent weakness, the same weakness which leads to exclusion upon objection. It may properly be said that such evidence may properly be given weight as *corroborative* of other competent legal evidence, but will not *alone* support a verdict or finding."

Plaintiff contends that although the precise total quantity cannot be proved, the evidence demonstrates that it was at least an amount of a value represented by the jury's verdict.

Defendant's position is that although Defendant's employees agreed in testimony that substantial quantities of potatoes were discarded as spoiled and although Defendant does not here and now question the jury's determination that Defendant is liable for the value of those spoiled, the verdict cannot stand because Plaintiff has not proved the extent of his damages with reasonable certainty.

Examining the issues on appeal we apply the familiar rule that the evidence must be viewed in the light which is most favorable to the Plaintiff. Barrett v. Greenall, 139 Me. 75, 27 A.2d 599 (1942). If the evidence is conflicting the jury's verdict will not be set aside unless it is clearly wrong. Bowie v. Landry, 150 Me. 239, 108 A.2d 314 (1954).

Unquestionably the Plaintiff has failed to demonstrate the exact quantity of potatoes which were spoiled and discarded. Proof of a precise quantity, however, is not required under such circumstances.

In Hincks Coal Co. v. Milan and Toole, 135 Me. 203, 193 A. 243 (1937) we said:

"It is an accepted rule of law that a party who claims compensation for a

wrong suffered must establish the amount of his damages with reasonable certainty. But absolute certainty is not required. Damages are not uncertain for the reason that the amount of the loss sustained is incapable of exact proof by mathematical demonstration. Juries are allowed to act upon probable and inferential as well as direct and positive proof. Any and all facts and circumstances having a tendency to show the probable amount of damages suffered are properly received and the triers of fact allowed to make the most intelligible and probable estimate which the nature of the case will permit. * * * It is not a sufficient reason for disallowing damages claimed that a party can state the amount only approximately. It is enough if from the approximate estimates of witnesses a specific conclusion can be reached." (Citations omitted.)

There, the Defendant Milan bought from Plaintiff large quantities of coal which were delivered to his several buildings over a period of fifteen years. Plaintiff was paid for some of this. However, as a result of a conspiracy between Milan and the other Defendant, Toole, who was in charge of Plaintiff's deliveries, no record was made of many of the deliveries and the Plaintiff was defrauded of their values. At trial, Plaintiff attempted to prove its damages by presenting several of its deliverymen who testified from memory as to the approximate quantities they had delivered to Milan during the various years and deduction was made of the quantities for which Milan had paid. The Referee found this evidence to be sufficiently certain to warrant the assessment of damages and this Court refused to disturb his findings.

The rule we stated in *Hincks Coal Co.* is one which has been recently applied by most courts to similar situations both in tort and in contract. Pendergrass v. Lovelace, 57 N.M. 661, 262 P.2d 231 (1953); McLaughlin v. Union-Leader Corporation, 100 N.H. 367, 127 A.2d 269 (1956); Maricopa County Municipal Water Conservation District No. 1 v. Roosevelt Irrigation District, 39 Ariz. 357, 6 P.2d 898 (1932); Steelduct Co. v. Henger-Seltzer Co., 26 Cal.2d 634, 160 P.2d 804 (1945); Stott v. Johnston, 36 Cal.2d 864, 229 P.2d 348 (1951); Darlington v. Bucks County Public Service Co., 303 Pa. 288, 154 A. 501 (1931); General Finance Corporation v. Dillon (10th Cir. 1949), 172 F.2d 924; 22 Am.Jur.2d, Damages, sec. 25.

We find that the modern attitude toward such situations is expressed in the language used by another frequently cited authority:

"The rule as to the recovery of uncertain damages generally has been directed against uncertainty as to fact or cause of damage rather than uncertainty as to measure or extent. In other words, the rule against uncertain or contingent damages applies only to such damages as are not the certain results of the wrong, and not to such as are the certain results but uncertain in amount.

In many cases, although substantial damages are established, their amount is, in so far as susceptible of pecuniary admeasurement, either entirely uncertain or extremely difficult of ascertainment; in such cases plaintiff is not denied all right of recovery, and the amount is fixed by the court or by the jury in the exercise of a sound discretion under proper instructions from the court. This is particularly true of torts, especially those resulting in personal injuries; but even in the case of contracts a party who has broken his contract will not ordinarily be permitted to escape liability because of the uncertainty in the amount of damage resulting, and the fact that the full extent of the damages for the breach must be a matter of speculation is not a ground for refusing all damages." 25 C.J.S. Damages § 28.

In this case there can be no doubt but that large amounts of Plaintiff's potatoes spoiled and it is not disputed here that Defendant was obligated to pay for them.

Our question is whether a reasonable basis was established for an intelligent approximation of the extent of Plaintiff's damages.

The credibility of the witnesses and the weight to be given to their testimony were for the jury. The jury could have found that Mr. Litz examined Plaintiff's exhibits 39 and 40 on which Plaintiff assembled his conclusions as to the quantity spoiled and that he agreed that Plaintiff's claim that approximately 3882 barrels had spoiled was reasonably correct and that Defendant would pay for them. The jury could properly have viewed this agreement by Mr. Litz not as evidence of a new parol contract to pay upon which this action could be maintained but as strong evidence of the amount due Plaintiff under the original contract. The Presiding Justice's charge is not before us so we assume that the jury was correctly instructed as to the manner in which this evidence could be considered. Mr. Litz was apparently in an excellent position to appraise Plaintiff's figures and to draw conclusions from his reasoning and his approval of Plaintiff's claim takes Plaintiff's figure of $10,869.00 out of the area of speculation. Plaintiff's own testimony as to his personal knowledge of the quantities shipped in certain cars, his presentation of corroborating consent evidence, his comparison of the shipments in issue with previous shipments in the light of his shipping practices, the evidence from the bills of lading, delivery receipts and vouchers and Defendant's employees' testimony as to the great amount of spoilage could not individually have justified the verdict which Plaintiff received. However, the jury could properly have found that they tended, cumulatively at least, to support the estimate which Plaintiff said he and Mr. Litz found reasonably to represent the spoilage.

We realize that Plaintiff was to receive only 40 cents per barrel for "Grade B" potatoes and the record does not show what percentage of the spoiled potatoes were Bs—indeed, this doubtless could not have been determined at time of unloading because of their decomposed condition. However, the privilege of determining the grade at the time of unloading was Defendant's and the Defendant was responsible for the situation which resulted in their not being graded. The jury was entitled to resolve uncertainties as to grade in favor of the Plaintiff. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684, 691 (1927); Hendrickson v. Grengs, 237 Minn. 196, 54 N.W.2d 105 (1952); McCullagh v. Goodyear Tire & Rubber Co., 342 Mich. 244, 69 N.W.2d 731 (1955); Novo Industrial Corp. v. Nissen, 30 Wis.2d 123, 140 N.W.2d 280 (1966); Stott v. Johnston, supra; Steelduct Co. v. Henger-Seltzer Co., supra; 22 Am.Jur., Damages, sec. 23. Furthermore, Plaintiff's estimate of the quantity spoiled and Mr. Litz' agreement with these figures were based only on the quantity which Plaintiff concluded would have been Grades 1 and 2. The delivery receipts show that only slightly less than ten percent of those accepted and paid for were Bs—a fact which very likely did not escape the attention of Aroostook County jurors and which may have entered into their conclusion that the Plaintiff's claim for $10,869.00 should be reduced to $10,000.00.

We cannot say that there was not sufficient credible evidence to support a jury verdict for this amount.

Appeal denied.