**Donald C. DAVIS**

v.

**STATE of Maine.**

Supreme Judicial Court of Maine.

June 22, 1973.

128

Vafiades, Brountas & Kominsky, by Marvin H. Glazier, Bangor, for plaintiff.

John W. Benoit, Jr., Deputy Atty. Gen., Augusta, for defendant.

Before DUFRESNE, C. J., and WEBBER, POMEROY and WERNICK, JJ.

DUFRESNE, Chief Justice.

The appellant, Donald C. Davis, appeals to the Law Court under 14 M.R.S.A. § 5508 from the unfavorable judgment of a Single Justice which denied him relief from a 1957 conviction of the crime of arson upon plea of guilty to such charge and left standing the ensuing sentence to Maine State Prison for a term of not less than 50 years and not more than 100 years. At the time of the hearing of the post-conviction habeas corpus, the appellant was on parole from said sentence.

Arrested on August 22, 1957 for violation of Section 2, Chapter 131 of the Revised Statutes of Maine, 1954 (now 17 M.R.S.A. § 152), the appellant was taken be-

fore the then Lincoln Municipal Court, where he entered a plea of guilty to the charge without the assistance of counsel, a prevalent practice in those days. The Judge made a finding of probable cause and bound the appellant over to the incoming September term of the Penobscot County Superior Court. On August 26, 1957, with the assistance of appointed counsel at the Superior Court level, he waived grand jury indictment under R.S. 1954, c. 147, § 33—Public Laws, 1955, Chapter 187—(now Rule 7(b), M.R.Crim. P.) and pleaded guilty to an information which charged the crime of arson in the following pertinent terms:

"That, Donald C. Davis, of Westbrook, in the County of Cumberland and State of Maine, on the fifteenth day of August, A.D.1957, at Lincoln, in the County of Penobscot and State of Maine, in the night time of said day, feloniously, willfully and maliciously did set fire to and thereby burn a certain building erected for public use, to wit: the Odd Fellows Hall building, said building being then and there used as a public motion picture theatre, there situate, against the peace of said State, and contrary to the form of the Statute in such case made and provided."

Initially, the appellant asserts error on the part of the Justice in the habeas corpus proceeding for not recognizing the fatal insufficiency of the information. We disagree.

He first contends that the charging instrument, the information, does not set forth the crime of arson as defined by R. S.1954, c. 131, § 2,[1] in that, although it alleges that the "Odd Fellows Hall building"

is a building erected for public use, nevertheless, from the face of the information itself, it obviously appears that the reference building is a private building erected for private purposes which, at the time of the fire, had been converted to a public use, to wit, a public theater. The Justice below so construed the accusation and dismissed the argument with the following statement:

"The Petitioner argues that the Odd Fellows Hall is a building erected for private fraternal meetings. However, the allegation in the complaint [information] is that it was then being used as a public motion picture theater, and the Court need not go beyond the allegation in saying that it was thus erected for public use and was within the meaning of the statute."

It is a well recognized principle of statutory construction that penal statutes are to be construed strictly and that a criminal offense cannot be created by inference or implication, nor can the effect of a penal statute be extended beyond the plain meaning of the language used. State v. Wallace, 1906, 102 Me. 229, 66 A. 476; State v. LeBlanc, 1916, 115 Me. 142, 98 A. 119; Tuttle Petr. v. State, 1962, 158 Me. 150, 180 A.2d 608. Nevertheless, the overriding controlling rule in the construction of statutes, including penal statutes, is for the courts to ascertain legislative intent and, once determined, to effectuate the same. State v. Gaudin, 1956, 152 Me. 13, 120 A.2d 823. Even though penal laws are to be construed strictly, yet the intention of the Legislature must govern in the construction of penal as well as other statutes, and they are not to be construed so strictly

---

1. R.S.1954, c. 131, § 2. Burning of public and private buildings.—
"Whoever wilfully and maliciously sets fire to any meetinghouse, courthouse, jail, town house, college, academy *or other building erected for public use*, or to any store, shop, office, barn or stable of his wife or another within the curtilage of a dwelling house, so that such dwelling house is thereby endangered and such public or other building is thereby burned in the nighttime, shall be punished by imprisonment for any term of years; but if such offense is committed in the daytime or without the curtilage of and without endangering a dwelling house, by imprisonment for not less than 1 year nor more than 10 years." (Emphasis added.)

as to defeat the obvious will of the Legislature. The intent and object of the Legislature in enacting the law are to be ascertained and given effect if the language be fairly susceptible of such a construction. Such interpretation of the words used will be adopted as shall appear most reasonable and best suited to accomplish the objects of the statute. State v. J. P. Bass Co., 1908, 104 Me. 288, 71 A. 894, 20 L.R.A.,N.S., 495; State v. Holt, 1962, 158 Me. 81, 179 A.2d 298.

The end sought in the arson statute by punishing the willful and malicious nighttime setting afire, and burning of, meetinghouses, courthouses, jails, town houses, colleges, academies *or other buildings erected for public use*, is to protect public buildings against those peculiar dangers which ordinarily attend public property, but to which dangers buildings in the private sector are not usually subjected.

The comprehensive attempt of the Legislature to deter arson militates against any purported constrictive intendment on the part of the Lawmakers in the use of the phraseology "erected for public use" which would support the conclusion that the legislation was aimed solely at protecting public use or purpose buildings when originally so designed, constructed and built, and not when such buildings were not so set up from the beginning. The proper course in all cases is to adopt that sense of the words which best harmonizes with the context and promotes in the fullest manner the policy and objects of the Legislature. United States v. Hartwell, 1867, 6 Wall. 385, 18 L.Ed. 830.

In view of the object manifestly sought to be accomplished and the mischief to be remedied by the statute, we believe the Legislature used the word "erected" in a broad and comprehensive meaning, synonymous with "set up" or "used" for public use. It is within the spirit and letter of the statute to bring within its coverage buildings which at the time of the setting of the fire and the burning were devoted to public use. See, Commonwealth v. Horrigan, 1861, Mass., 2 Allen 159.

Secondly, the appellant further contends that the information is fatally inadequate in that, although it alleges the crime to have been committed in the nighttime of August 15, 1957, it omits to indicate the specific hour or exact time when the act of arson took place. This Court has not expressly ruled upon such a contention in the past. The appellant finds support for his position in old treatises on the subject of criminal law which state very distinctly that in indictments of this kind, whether for arson or burglary, the particular hour should be laid. See, 1 Russell 826; 2 East P.C. 513. (But, see common law authorities to the contrary mentioned in State v. Robinson and McClune, 1871, 35 N.J.L. 71, at page 73). The rationale for such a rule is expressed in the dictum which appears in Commonwealth v. Williams, 1849, 56 Mass. (2 Cush.) 582:

> "It has been considered proper and *necessary*, until the statute of 1847, c. 13, *and such are the usual precedents*, to state some particular hour of the night, in which the burglary was alleged to have been committed. The reason for this seems to have been, that one might with a felonious intent have broken and entered a building, at a time properly called in popular language nighttime, and yet not have committed the crime of burglary; the time in which that offence can be committed being not so far extended as to embrace the night-time, in the ordinary use of that word, but a period when the light of day had so far disappeared, that the face of a person was not discernible by the light of the sun or twilight."

To the same effect, see State v. G. S., 1802, Vt., 1 Tyler 295, 4 Am.Dec. 724.

This controversy which developed at early common law caused indictments, where nighttime was an element of the crime or a circumstance for enhanced punishment, to

specify the hour of the crime as being "about the hour of twelve o'clock in the night of said day." See, Shelton v. Commonwealth, 1892, 89 Va. 450, 16 S.E. 355; State v. Bancroft, 1839, 10 N.H. 105; Commonwealth v. Squire, 1840, 42 Mass. (1 Metc.) 258; State v. Seymour, 1853, 36 Me. 225. This was a mere technicality, since the proof could show any other hour during that particular night at which time the crime was committed, provided it was within the common law definition of nighttime.

Maine, at the time of the instant conviction, had no statute of general application defining nighttime when used in statutory provisions relating to crime. This is still true today. However, certain statutes, in respect to some specific criminal conduct, did set up the time period within which it would be considered nighttime: see, R.S.1954, c. 22, §§ 136, 43 (now 29 M.R.S.A. §§ 1071, 1366) display of lights of vehicles; R.S.1954, c. 37, § 54 (now 12 M.R.S.A. § 2651) ice fishing; R.S.1954, c. 37, § 77 (now 12 M.R.S.A. § 2455) night hunting; R.S.1954, c. 37, § 113 (now 12 M.R.S.A. § 2358(7)) hunting raccoons; R.S.1954, c. 61, § 93—circumstances under which liquor law enforcement officers could stop motor vehicles. In the absence of statute, the common law concept of nighttime controls. See, Trull v. Wilson, 1812, 9 Mass. 154.

As stated in 2 Wharton, Criminal Law and Procedure (Anderson) § 431, p. 54:

"In the absence of statute, the determination of night is not the setting and rising of the sun. Instead, it is deemed day although the sun has not yet risen or after it has set, if it is sufficiently light to discern a person's face. That is, visibility by daylight determines the existence of day."

The Georgia Court, in Bethune v. State, 1873, 48 Ga. 505, at 509, quoted from 1 Bishop on Criminal Law, section 163, as follows:

"The common law now is, and for a long period has been, that those portions of the morning and evening in which, while the sun is below the horizon, sufficient of [its] light is above for the features of a man to be reasonably discerned, belong to the day. Light reflected from the moon is not to be taken into the (sic) account."

See also, State v. Bell, 1966, 153 Conn. 540, 219 A.2d 218; State v. Mollicone, 1962, 95 R.I. 59, 182 A.2d 612.

Our arson statute provides for enhanced punishment when the act of arson is committed in the nighttime. To lay the basis for the greater penalty, it is necessary to allege and prove that the crime was committed in the nighttime. The statute, however, does not require that the act should be committed at any particular hour of the night. The burning of the property is no less arson if committed at one hour in the nighttime rather than at another hour of the same night, thus indicating that the particular hour of the night is not of the essence of the crime of arson and therefore need not be alleged. The mere allegation that the crime was committed in the nighttime of a certain day is sufficient. People v. Burgess, 1868, 35 Cal. 115; Bethune v. Georgia, supra; Leisenberg v. State, 1900, 60 Neb. 628, 84 N.W. 6; State v. Robinson and McClune, supra.

Thirdly, the appellant claims entitlement to relief from his 1957 guilty plea and subsequent conviction due to a violation of due process at the preliminary hearing in municipal court, since he was allowed to appear with no counsel and plead guilty to the charge without being advised that he had the right to have counsel appointed to represent him in the proceedings. Reliance is placed upon Coleman v. Alabama, 1970, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 wherein the United States Supreme Court held that a preliminary hearing is a critical stage in a criminal prosecution entitling the accused to appointed counsel if he cannot afford one.

Prior to *Coleman*, the preliminary hearing in Maine was not considered a critical stage of criminal prosecutions. Irregularities occurring in felony cases at the District Court level were not within the scope of post conviction relief and were cured by the petitioner's subsequent plea of guilty to an information or indictment. See, Holbrook v. State, 1965, 161 Me. 102, 208 A.2d 313, where we stated:

"We recognize . . . that events occurring at or in connection with the preliminary hearing stage may become significant but only insofar as such events have an 'appreciable effect' upon subsequent proceedings at the higher court level."

In Joy v. State, 1967, Me., 230 A.2d 231, where the defendant raised the point that at the preliminary hearing he was not offered or afforded assistance of counsel, our Court said:

"The proceedings in the Superior Court on the information were de novo. In no way was the petitioner prejudiced by action in the Municipal Court."

In State v. Pullen, 1970, Me., 266 A.2d 222, this Court asserted that preliminary examinations in Maine had no other purpose than to afford a person arrested upon complaint an opportunity to challenge the existence of probable cause for detaining him or requiring bail pending grand jury action and were not intended as a means of discovery in aid to trial preparation. *Coleman*, which was decided some 12 days after the *Pullen* decision, took a view contrary to *Holbrook, Joy* and *Pullen* and held that

a person accused of crime under the Constitution of the United States "requires the guiding hand of counsel at every step in the proceedings against him," Powell v. Alabama, 1932, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158,

and that

said constitutional principle is not limited to the presence of counsel at trial, but extends to such formal or informal, in court or out of court stages of the criminal prosecution, where counsel's absence might derogate from the accused's right to a fair trial, United States v. Wade, 1967, 388 U.S. 218, 226, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149,

and that

the pretrial confrontation of the accused at preliminary hearings to determine probable cause is a critical stage of the criminal prosecution, in which potential substantial prejudice to defendant's rights inheres, the avoidance of which entitled the accused to the aid of counsel as at the trial itself.

We recognize the binding effect upon this Court of such interpretation of the Constitution of the United States respecting the right to counsel of persons accused of crime. The United States Supreme Court, however, in Adams v. Illinois, 1972, 405 U.S. 278, 92 S.Ct. 916, 31 L.Ed.2d 202 refused to give retrospective applicability to the *Coleman* constitutional principle. The briefs in the instant case were filed prior to the *Adams* decision. We have no intention of going beyond the *Adams* ruling and, therefore, the appellant takes nothing by reason of this claim of error.

Finally, the appellant, in his statement of points on appeal, claimed error below in the Single Justice's ruling that he had knowingly, voluntarily and intelligently entered his plea of guilty to the charge of nighttime arson.

The Justice below, in his disposal of the reference claim, recited the following underlying reasoning for his decision:

"The facts developed at the hearing fail to support these allegations. In fact, the weight of evidence is to the contrary. The Court heard the testimony of the Petitioner, the Justice of the Superior Court who sentenced the Petitioner, and the Petitioner's Court appointed Attorney. The Court gauges the proceeding

by the standard in practice in 1957. The sentencing Justice testified and his testimony reveals a full, complete and faithful compliance with these standards. He found that the Petitioner's plea was entered voluntarily after he had been made aware of the meaning of the plea, the rights that he was waiving by the plea and the result which could follow. The entry of the plea under these circumstances is an effective waiver of Petitioner's right to trial by jury and to be confronted by the witnesses for the State."

■ We have read the record with great care. The involuntariness of his plea, under the appellant's contention, on the grounds that, in one alternative, it was the result of threats and coercion by agents of the State, or, in the other alternative, it was induced by promises of leniency on their part, was a question of fact for the fact-finder and, in this aspect, the decision of the Justice below is invulnerable, as no clear error appears in that respect. Gordon v. State, 1967, Me., 232 A. 2d 527; Stone v. State, 1966, Me., 222 A. 2d 153; Rule 52(a), M.R.Civ.P.

■ Even though Rule 11, M.R.Crim. P., was not in effect when the appellant entered his plea of guilty to nighttime arson of a public building, such plea, in order to withstand constitutional challenge, must have been made voluntarily, not only in the sense that it must be the free choice of the accused uninfluenced by threats, coercion or promises of leniency, but voluntarily also in the sense that it must have been tendered with understanding of the nature or meaning of the charge.

In Gordon v. State, supra, where the validity of a pre-Rule 11 plea was involved (conviction having taken place at the January term 1965 of the Penobscot Superior Court), this Court approved the lower Court's effort to make sure that the plea of guilty was the product of the defendant's *wilful* and *intelligent* choice, and added that, when such procedure obtains, such

plea is made and accepted within the safeguards of the Constitution surrounding and protecting the accused.

In Tuttle, Petr. v. State of Maine, 1962, 158 Me. 150, 180 A.2d 608, again before Rule 11, M.R.Crim.P., which became effective on December 1, 1965, where the statutory information process was under attack for unconstitutionality, this Court expressed the dual concept of a constitutionally proffered plea of guilty in these terms:

"The oath bound Justice must conscientiously sustain and execute the responsibility of enlightening the accused and of safeguarding the *free* as well as *intelligent* action of the respondent." (Emphasis supplied.)

Again, in Randall v. State, 1970, Me., 267 A.2d 923, this Court ruled that there had been no violation of the petitioner's constitutional rights, where the record in its entirety demonstrated that a 1960 plea of guilty had been tendered voluntarily and understandingly.

■ The first and most universally recognized requirement of due process constitutionally mandated in connection with the entering and acceptance of a plea of guilty to a criminal accusation is the giving to the accused of "real notice of the true nature of the charge against him." Smith v. O'Grady, 1941, 312 U.S. 329, 61 S.Ct. 572, 85 L.Ed. 859.

In the instant case, even though the trial Justice did not have the benefit of the standards mandated by Rule 11, M.R. Crim.P. which were adopted more than eight years later, the record of the post-conviction habeas corpus proceeding indicates that he did carry a substantial colloquy with the appellant which tended to accomplish the same purpose as the Rule was designed to accommodate. It appears from the testimony of the trial Justice at the habeas corpus hearing that, in 1957, the practice was to have a reporter present at information proceedings, provided one was

available. Neither party questions the non-existence of a record at the arraignment level.

The appellant claims that his plea of guilty was not a knowing and intelligent plea as a matter of law, because neither the trial Justice nor his attorney informed him of the distinction between nighttime and daytime in the light of the common law definition. It must be conceded from the testimony of the trial Justice and the petitioner's trial attorney that neither briefed Davis as to when the crime of arson would be nighttime arson as distinguished from daytime arson within the meaning of Revised Statutes, 1954, c. 131, s. 2. The Presiding Justice stated that he recalled some mention being made of the hour of the day, but could not remember what that hour was. Trial counsel admitted that he assumed the acts were committed in the nighttime.

■ We are aware that the time when arson is committed is not an element of the crime, but rather a circumstance of aggravation which will determine the severity of the punishment. Nevertheless, when statutes provide for increased punishment where crimes are committed under aggravated circumstances, the particulars of aggravation are so intimately connected with the "nature" of the accusation that they must be alleged in the indictment or information and proved at trial for the accused to be sentenced to the greater penalty.

See, State v. Ferris, 1969, Me., 249 A.2d 523:

"[When] the State decides the alleged assault and battery is one in which the circumstances indicate it was high and aggravated in its nature, then the defendant is entitled to an allegation to this effect in order that he be informed of what he has to meet in the trial of the case. In all criminal prosecutions the defendant has the constitutional right to know the *nature* and cause of the accusation." (Emphasis supplied)

See also, State v. Neddo, 1898, 92 Me. 71, 42 A. 253:

"It is well settled that if a crime is punishable more heavily when committed in the night time, the indictment, to justify the heavier punishment, must charge it to have been committed in the night time, but ordinarily if only the lower punishment is sought to be inflicted, the allegation of day time is not essential."

We recognize that our Rule 11, M.R. Crim.P. which requires, before the Court may accept a plea of guilty, a determination that the plea is being made voluntarily with understanding of the nature of the charge does not state, as the federal rule does, that, in addition thereto, the plea of guilty must be made with understanding of "the consequences of his plea." The amendment, effective July 1, 1966, was merely declaratory of the prior law. See, Kercheval v. United States, 1927, 274 U.S. 220, 47 S.Ct. 582, 583, 71 L.Ed. 1009; Trujillo v. United States, 1967, 5 Cir., 377 F.2d 266.

"In order to determine whether a plea of guilty is made with understanding of the nature of the charge, it is necessary for the court to take steps to satisfy itself that the defendant understood: '(1) the meaning of the charge, (2) what acts are necessary to establish guilt, and (3) the consequences of pleading guilty to the charge." Munich v. United States, 1964, 9 Cir., 337 F.2d 356. See also, Pilkington v. United States, 1963, 4 Cir., 315 F.2d 204; Burch v. United States, 1966, 8 Cir., 359 F.2d 69, at 73.

Chief Justice Burger, when sitting on the Circuit Court of Appeals, defined an understanding plea as one made with knowledge of the *meaning* of the charge by one who knows what *acts* amount to being guilty of the charge and the *consequences* of pleading guilty thereto. See, Edwards v. United States, 1958, 103 U.S.App.D.C. 152, 256 F.2d 707.

In Clewley v. State, 1972, Me., 288 A.2d 468, we said in effect that where the Pre-

siding Justice had not ascertained that the defendant was aware what underlying facts were necessary to support the charge of larceny where the highly technical concept of "continuing larceny" was involved, there was no possibility of a finding that the accused had tendered his plea of guilty "voluntarily with understanding of the nature of the charge." We appreciate that *Clewley* was a case in which Rule 11 requirements were applicable, while in the instant case the guilty plea was accepted in 1957 prior to the present refinements in plea taking.

 Even though our present Rule 11 surrounding the acceptance of guilty pleas had not been promulgated at the time of the petitioner's tendered plea of guilty, proven constitutional infirmities such as the involuntariness of the plea or the failure of the defendant to know the nature of the charge, to be aware of the statutory circumstances for potential enhanced punishment and of the likely consequences to result from the plea, are not beyond remedial relief. Post conviction remedies exist for that very purpose, regardless of retroactivity vel non of subsequently adopted constitutional concepts. The Due Process Clause requires that the plea be voluntary and knowledgeable. Halliday v. United States, 1969, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16; Cote v. State, 1972, Me., 286 A.2d 868.

The United States Supreme Court has said as much in Brady v. United States, 1970, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed. 2d 747:

> "But the plea [of guilty] is more than an admission of past conduct; it is the defendant's consent that judgment of conviction may be entered without a trial —a waiver of his right to trial before a jury or a judge. Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."

The issue of the voluntariness and knowledgeability of the plea is further complicated in the instant case by the fact that no record exists concerning the original information proceeding in which the appellant's plea of guilty and judgment of conviction were entered. Because of this omission, Davis initially claims automatic entitlement to have his plea and conviction set aside under the authority of Boykin v. Alabama, 1969, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274. We disagree.

 True, *Boykin* requires that there be an affirmative showing on the record that the plea was made intelligently and voluntarily. But in Maine our post conviction habeas corpus remedy provides the mechanism for fairly establishing a record of the plea-taking proceeding and for determining on that record the validity of the guilty plea. Such fact-finding process for determining the validity of guilty pleas is not inherently unreliable. The record established in post conviction proceedings is adequate compliance with the constitutional imperatives of *Boykin*. We noted in Morgan v. State, 1972, Me., 287 A.2d 592, that the Supreme Court of the United States expressly recognized the right of a State Court to resort to *evidence adduced in post-conviction proceedings* to find affirmative record support that a guilty plea was voluntarily and understandingly tendered. See, North Carolina v. Alford, 1970, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162.

 Since in 1957 the practice of taking pleas of guilty from defendants accused of felonies did not come within mandated rule requirements such as provided in our Rule 11, M.R.Crim.P. and since a serious disruption of the administration of justice would probably result in cases where guilty pleas were accepted years ago and witnesses for the State as in the instant case are either deceased or unavailable, and since a defendant has the opportunity to frustrate the State's defense by mere purposeful time lapse, it is but fair that a record of conviction, prior to the

adoption of rule guidelines to guarantee the voluntariness and accuracy of guilty pleas, carry the ordinary presumption of regularity sufficient to leave the burden of proof respecting involuntariness and un-knowledgeability of the plea, where it usually lies, upon the habeas corpus petitioner under the usual standard of the fair preponderance of the evidence.

Hence, we must have in mind in the instant case that the burden of proof by a fair preponderance of the evidence rests on the petitioner and that all findings of fact by the Justice in the post conviction proceeding stand unless "clearly erroneous." Bennett v. State, 1965, 161 Me. 489, 496, 502, 214 A.2d 667; Gordon v. State, 1967, Me., 232 A.2d 527.

The petitioner contends that he has met these burdens by reason of two pieces of evidence, 1) the municipal court complaint alleging the offense as "occuring (sic) on or about 8:15 p. m. on the evening of said 15 August 1957" which was admitted into evidence by agreement of the parties, and 2) the parties' stipulation that the Old Farmer's Almanac would show that on August 15, 1957 "the sun would have set at 6:46, which would make it 7:46 under Daylight Saving Time being used in Maine at that time," even though the State reserved its objection to such offer of proof as to correctness, relevancy and materiality. The Justice below ruled the evidence of time proffered by the almanac as irrelevant in the post conviction proceeding. We cannot agree with the petitioner's contention.

The petitioner was attempting to show that the time of the occurrence of the fire was one minute less than a half hour after sunset, i. e. daytime arson under the common law concept of daytime. We agree that the municipal court complaint was consent evidence, and, since it was a statement under oath by a State investigator since deceased, it had some probative value. In Goldthwaite v. Sheraton Restaurant, 1958, 154 Me. 214, 145 A.2d 362, 79 A.L.R.2d 881, our Court said:

"In order to clarify the subject for the future in this jurisdiction, it may now be stated that such evidence [hearsay] may properly be considered and given its natural and logical probative effect. The factfinder must always, however, weigh such evidence with caution, mindful of its inherent weakness, the same weakness which leads to exclusion upon objection. It may properly be said that such evidence may properly be given weight as *corroborative* of other competent legal evidence, but will not *alone* support a verdict or finding."

This evidence in the eyes of the factfinder at the post conviction hearing may have been considered not only weak, but of very flimsy value for a variety of reasons: 1) the allegation was not couched in any degree of positivity, but rather dealt in the realm of approximation, 2) the period involved only one minute, 3) he was aware that the State at trial was not bound by the time alleged in the initial municipal court complaint, and 4) the statement of time was uncorroborated by any other evidence. The only direct evidence is the petitioner's own admission when asked

"Q. Well, if you knew that you should not have been put away, why didn't you say, 'not guilty'?"

and he responded

"A. I was guilty."

The proffer of the Old Farmers Almanac to determine the time at which the sun set at Lincoln, Maine, on August 15, 1957 is not corroborative of the fact that the arson took place at that time. Whether almanac forecasts of the rising or setting of the sun or moon may be received in evidence to prove the movements of these planets with such exact certainty that courts will take judicial notice of such facts through them, we need not decide. But see, Munshower v. The State, 1880, 55 Md. 11.

The record indicates that all concerned, the petitioner, the petitioner's counsel and the Justice presiding at the sentencing proceeding, were talking and acting in terms of a nighttime arson case. The petitioner was telling the judge that he should be confined until he was cured of his pyromaniac tendencies which he then described as irresistible sexual urges. The colloquy as testified to by the Justice reveals the full understanding which the petitioner had of the underlying circumstances and the consequences he was facing;

"Q. I think you understand your problem better than I do and better than I can. What do you think I should do? I have got to sentence you, of course; I have got to sentence you to prison in view of your past record, and from what you tell me now, what kind of a sentence should it be? What do you think would be the result if I gave you a five to ten year sentence in prison? [the maximum sentence for daytime arson]

"A. I think that I would start another fire just as soon as I got out.

"Q. Well, what do you feel that I should do?

"A. I think it is your duty to put me away, so I can never get out again. I don't want to spend the rest of my life in prison; I am hoping somehow I can be cured of that."

The Presiding Justice further testified:

"I am sure that I wouldn't have let him plead guilty or allow the guilty plea to stand, if the evidence later, or if I was told later, in regard to sentence, in regard to what happened on this occasion, indicated that it was in the day time, but I just can't remember the details."

There is no showing on this record that had counsel pursued a factual inquiry covering the time of the commission of the crime such a pursuit would have uncovered sufficient factual data to indicate that the crime was committed in the daytime instead of in the nighttime within the common law concept of daytime. Petitioner himself never testified that it happened in the daytime. His present claim is that he was never informed of the common law definition.

Counsel's failure properly to inform himself of facts that would have shown the existence of a defense to the charge of nighttime arson might possibly have given rise to the charge of incompetency of counsel in connection with the tendering of the guilty plea. But where the prisoner assures his counsel that the crime was committed in the nighttime and insists on pleading guilty to the charge of nighttime arson because he is guilty, and his plea of guilty is tendered with approval of counsel, before such a plea may be set aside, the petitioner must demonstrate that the attorney's conduct in allowing him to plead guilty to the charge was not at the time within the range of competence demanded of attorneys in criminal cases. The petitioner's claim of incompetent counsel conduct rests solely on a bare possibility that a proper investigation would have produced factual data supportive of a defense to the charge. He claims that, notwithstanding his assertion of guilt and insistence on pleading guilty by way of information instead of by the indictment route, his attorney should have conducted an independent investigation to corroborate or dispute the charge. He failed to demonstrate, however, by the fair preponderance of the evidence that such an inquiry into the facts would have revealed that the crime of arson of which the petitioner was charged probably had been committed in the daytime. There is nothing in this record that impeaches or even suggests that Davis' plea of guilty was anything but the truth.

Notwithstanding the fact that the petitioner might not have known the common law concept of daytime, he has failed to prove by a fair preponderance of the evi-

dence that his plea of guilty to nighttime arson, with advice of counsel, was not voluntary and intelligent.

The entry will be

Appeal denied.

All Justices concurring.

WEATHERBEE and ARCHIBALD, JJ., did not sit.