STATE of Maine

v.

Frank T. TULLO.

Supreme Judicial Court of Maine.

Dec. 2, 1976.

Paul Dionne, Asst. County Atty., Lewiston, J. Scott Davis, Student Prosecutor, Auburn, for plaintiff.

Lendall L. Smith, Brunswick, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE,* POMEROY, WERNICK and ARCHIBALD, JJ.

DUFRESNE, Chief Justice.

On July 30, 1974 Constance Martel was living on the Ferry Road in Lewiston, Maine in a two-level home which she owned jointly with her husband. The house is set about twenty-five feet from the road on a 3½ acre plot some 1½ miles from the nearest neighbor. The Martels both work during the daytime, but on this particular day Mrs. Martel felt ill and returned home shortly after the clock struck twelve noon. Alone in the house, she was resting in bed when at 1:30 or thereabouts she heard an automobile approaching. Anxious to find out who might be coming to visit, she went to the bedroom window and saw two male strangers exit from a station wagon parked in the road. She thought there were three other individuals in the car. The paint job on the vehicle attracted her attention as she observed an undercoating of white over which a black primer had been spread. The two individuals went to the front door, rang the bell and, when no response was forthcoming, they opened the aluminum combination screen door and tried the inner wooden door by turning the doorknob. The security of the building at the front door caused them to repair to the garage doors which they tested for fastness without success. At that point Mrs. Martel's blaring radio torpedoed any further reconnoitering, and the two subjects were seen running away to re-enter the waiting station wagon which then quickly vanished from the area.

Mr. Martel and the police were called to the home and Mrs. Martel gave a full recital of the previous events, together with a description of the two visitors.

After their departure, Mrs. Martel did not go back to bed. She was not destined, however, to get the rest she contemplated that afternoon. Barely one half hour had gone by, when the same car reappeared and the same two men moved towards the front door again. The automobile, in which there were three other occupants, this time around was stopped in the driveway; this permitted Mrs. Martel to notice the front license plate made of cardboard on which the license numbers were written in pencil. On this second trip, the two subjects again opened the combination screen door and then pounded on the inner wooden door. At that point Mrs. Martel, who was at the upper level, made loud noises to indicate her presence in the house. The outer door was then shut and

* WEATHERBEE, J., sat at argument and participated in consultation, but died prior to preparation of opinion.

Mrs. Martel, who had then reached the front door, opened the same, locked the combination door and asked the two visitors what they wanted, to which they replied: "Nothing." The group then left without delay.

Shortly thereafter, Mrs. Martel went to the Lewiston Police Station where she identified the defendant from a display of six photographs of different individuals. Having been alerted through radio contact, a Lewiston police officer stopped a 1966 Ford Falcon station wagon with black primer marks answering the description given by Mrs. Martel. The defendant was the operator and five people were in the car.

On the basis of the reference scenario, the defendant was charged with the commission of the crime of willfully attempting to enter a dwelling house without the permission of the owner or occupant, the complaint alleging that

"on 30th day of July, 1974, in the City of Lewiston, County of Androscoggin, and State of Maine, the above named defendant, Frank Tullo, did then and there wilfully attempt to enter the dwelling house of Mr. and Mrs. Roger Martel without the permission of the owners or occupants thereof, and pursuant to said attempt, did open the outer door to said dwelling house and did turn the doorknob of the inner door in an unsuccessful attempt to gain entry."

contrary to the provisions of 17 M.R.S.A., § 3854.[1]

Tried before a jury in the Superior Court (Androscoggin County), the defendant was found guilty as charged and he appeals to the Law Court from the ensuing judgment and sentence, the latter being incarceration in the county jail for the term of ninety (90) days. We deny the appeal.

## I

### *Motion for new trial*

After jury verdict, judgment of conviction and sentence, the defendant seasonably filed a motion for new trial or, in the alternative, for judgment of acquittal on the ground that the evidence was insufficient to support a conviction of the crime of attempted criminal trespass. His underlying contention in support of his claim of error in the denial of his motion is that the defendant was identified at the trial as the perpetrator of the attempted trespass by only one witness, Mrs. Martel, and that her testimony was unreliable and insufficient to support a conviction to the degree of proof beyond a reasonable doubt. We disagree.

■ Proof beyond a reasonable doubt, so as to warrant conviction, may rest upon the testimony of a single witness. *State v. Trask,* 1966, Me., 223 A.2d 823, 825; *State v. Newcomb,* 1951, 146 Me. 173, 78 A.2d 787. A review of the evidence convincingly supports the jury who resolved the issue of credibility in favor of the State and against the defendant. Furthermore, there was some corroboration from the arresting officer in the fact that the defendant, shortly after the occurrence, was stopped at the wheel of the automobile described by Mrs. Martel, which automobile she later positively identified when she came upon it on her way from the restaurant on the evening of the day in question.

In support of his claim of error in relation to the denial of the motion for acquittal or new trial, the defendant further advances the argument that the evidence at trial falls short of sustaining the State's burden of proof beyond a reasonable doubt respecting a necessary element of the stat-

1. 17 M.R.S.A., § 3854, sub-§ 2 (P.L.1973, c. 494, sec. 1)

   *Entry of certain buildings.* Whoever willfully enters, or attempts to enter, any dwelling house, camp, cottage or locked building, without the permission of the owner or occupant thereof, shall be punished by a fine of not more than $100 or by imprisonment for not more than 90 days, or by both.

utory crime charged, to wit, the *willful* attempt to enter the Martel dwelling house without the permission of the owner or occupant thereof. Again, we disagree.

The statute, 17 M.R.S.A., § 3854, at the time of the alleged offense, defined the misdemeanor type of criminal trespass in the following terms:

"Whoever willfully enters, or attempts to enter, any dwelling house . . ., without the permission of the owner or occupant thereof, shall be punished . . ." (Underscoring ours).

In order to resolve the issue whether the evidence in the instant case supported the criminal trespass charge beyond a reasonable doubt, one must initially determine what type of conduct the Legislature meant to proscribe by prohibiting the "willful" entry, or "willful" attempted entry, of a dwelling house without permission of the owner or occupant thereof. In other words, in what sense was the term "willful" used?

■ The word "willful," in common parlance and, generally speaking, in statutory enactments proscribing specific conduct, relates to an act or omission done intentionally, deliberately, and/or designedly, as distinguished from an act or omission done accidentally, inadvertently, or innocently. *State v. Russell,* 1968, 73 Wash.2d 903, 442 P.2d 988, 991; *State v. Clark,* 1860, 29 N.J.L. 96.

■ Every unauthorized entry on the land of another is a trespass and anyone who makes such an entry is a trespasser. *Foley v. Farnham Co. (Malloy v. Farnham Co.),* 1936, 135 Me. 29, 34, 188 A. 708.

■ The law provides a civil remedy for trespasses as such, provided they are intentional and voluntary. As stated in *Hayes v. Bushey,* 1964, 160 Me. 14, 17, 196 A.2d 823, 825:

"It is necessary to keep in mind the distinction between the intention to do *a wrongful act or commit a trespass* and the intention to do *the* act which results in or constitutes the intrusion. One may intend to enter upon the land of another but under the reasonable misapprehension that his entry is lawful. Such a mistake does not avoid his liability for trespass. It is only the intention *to enter* the land of another that is an essential element of trespass and the absence of such an intention or such negligence as will substitute therefor will destroy liability." (Emphasis in original)

At common law, however, a mere invasion of private property was not a crime, unless it was accompanied by, or tended to create, a breach of the peace. Criminal sanctions against unauthorized entries upon the land of another were imposed, if at all, for the protection of public safety, rather than for the protection of the property rights of the owner or occupant. Relief in the case of trespasses involving no breach of the public peace was limited to self-help in removing the trespasser or to a civil action for damages. *People v. Goduto,* 1961, 21 Ill.2d 605, 174 N.E.2d 385; *State v. Wheeler,* 1830, 3 Vt. 344, 348.

Section 3854 of Chapter 17 (P.L.1955, c. 405—P.L.1973, c. 494) imposes criminal liability for an entry or attempted entry of a dwelling house without permission of the owner or occupant thereof, only if the entry or the attempt to enter is "willful." But the word "willfully" in the statute means something more than a voluntary act, and more, also, than an intentional act which in fact is wrongful. Otherwise, the use of the word "willfully" would be mere surplusage.

■ Whether the literal meaning of the words of a statute will control as against a broader or more narrow interpretation of their possible intendment depends upon the policy the Legislature is seeking to imple-

ment and the goals it intends to reach through such legislation. *Finks v. Maine State Highway Commission,* 1974, Me., 328 A.2d 791, 797.

Legislative intent, if ascertainable, must prevail and be given effect. *Finks,* supra, at 797; *Davis v. State,* 1973, Me., 306 A.2d 127, 130.

Nothing should be treated as surplusage, if a reasonable interpretation supplying meaning and force is possible, and this, in the construction of a criminal statute. See *Finks,* supra, at 799; *National Newark & Essex Bank v. Hart,* 1973, Me., 309 A.2d 512, 520.

The law making an attempt to enter a dwelling house without permission was enacted to better protect the owner or occupant thereof in the enjoyment of his property, but it could not have been the purpose of the Legislature to punish voluntary entries, or attempts to enter, made with innocent intentions, even in the absence of permission of the owner or occupant. Thus, the use of the term "willful" in penal statutes, including criminal trespass statutes, has uniformly been held to comprehend and import, not only that the act was done intentionally or deliberately, but that it was done with a bad or evil purpose, or without lawful excuse or justification, or wantonly and in disregard of the rights of others. See *Wass v. Stephens,* 1891, 128 N.Y. 123, 28 N.E. 21, 23; *Parker v. Parker,* 1897, 102 Iowa 500, 71 N.W. 421, 422; *Tufts v. State,* 1899, 41 Fla. 663, 27 So. 218; *McMorris v. Howell,* 1903, 89 App.Div. 272, 85 N.Y.S. 1018; *Rosenberg v. State,* 1933, 164 Md. 473, 165 A. 306; *Thornton v. State,* 1940, 63 Ga. App. 255, 10 S.E.2d 714; *State v. Russell,* 1968, 73 Wash.2d 903, 442 P.2d 988.

Our own Court in *Blaisdell v. Daigle,* 1959, 155 Me. 1, 2, 149 A.2d 904, interpreted the word "willfully" as used in the statute providing double damages in the case of a willful or knowing trespass to have

been intended "to embrace conduct on the part of the defendant which displays an utter and complete indifference to and disregard for the rights of others."

The Legislature, in enacting the wrongful attempted entry statute, intended to proscribe, and did proscribe, only such attempted without-permission entries as were willful in the sense that they were made under circumstances exhibiting either bad motives, no legitimate reason or reckless disregard of the rights of the owner or occupant.

The evidence in the instant case was credible and, under all the circumstances surrounding the occurrences at issue, fully warranted the jury in finding the defendant guilty beyond a reasonable doubt. *State v. Goldman,* 1971, Me., 281 A.2d 8, 12; *State v. Jackson,* 1974, Me., 317 A.2d 814. Only a very naive jury would have discounted the obvious character of the mission which brought the defendant and his cohorts to the home of Mrs. Martel whose fortuitous illness deprived them of the fruits of their evil plot.

## II

### Mr. Martel's testimony

Roger Martel, the husband, was permitted to testify as a witness for the State over the defendant's objections, although his identity as a potential State witness had not been disclosed prior to trial. The defendant claims prejudicial error, where Mr. Martel was permitted to testify that he was a joint owner of the premises, that he never had seen or heard of Frank Tullo, nor had he ever given permission to Mr. Tullo to enter his home.

The instant record fails to disclose that any motion was made in the trial court for discovery of the names and addresses of the witnesses whom the State intended to call at trial. Tullo does not dispute this fact, but argues that, since a list of State witnesses had been furnished him by the

prosecutor, it was reversible error for the Court to permit Mr. Martel to testify at the call of the State on direct examination, where he had not been listed by the State as a potential witness.

Rule 16(a), M.R.Crim.P. mandates disclosure by the State, among other things, of *written or recorded statements of witnesses* on the defendant's timely motion for discovery of the same upon a showing that such statements may be material to the preparation of his defense and that the request is reasonable. Rule 16(a) was not violated in this case, since the rule does not relate to the furnishing of a list of potential State witnesses, but is limited to making accessible to the defendant the *written or recorded statements* of witnesses in the possession of the State, without regard to the fact, whether these witnesses might be potentially favorable to the State or otherwise. Furthermore, the defendant's failure to comply with the preliminary requirements of Rule 16(a), such as the filing of the discovery motion and the making of the requisite showing of need and reasonableness, would estop the defendant from claiming error under the rule.

In the absence of statute or court rule, it is within the discretion of the trial court, whether the State may be ordered to produce a list of the prosecution's witnesses. See *United States v. Jordan*, 1972, 4 Cir., 466 F.2d 99, cert. den. 409 U.S. 1129, 93 S.Ct. 947, 35 L.Ed.2d 262.

The State in special circumstances may have a legitimate interest in keeping confidential the identity of its prospective witnesses. As stated in *People v. Lopez*, 1963, 60 Cal.2d 223, 32 Cal.Rptr. 424, 437, 384 P.2d 16, at 29, cert. den. 375 U.S. 994, 84 S.Ct. 634, 11 L.Ed.2d 480, reh. den. 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 660:

"There must be a balancing of the right of a defendant to discover potentially material witnesses with the probability that such discovery might lead to the elimination of an adverse witness or the influencing of his testimony. In balancing these competing factors the trial court must be allowed great discretion."

On the other hand, in ordinary circumstances, it is customary, as was done in the instant case, for the prosecution to submit its list of witnesses to the defendant upon request, without need for court intervention. Such voluntary disclosure of the State's witnesses may gain the defendant the necessary access to information vital to an effective attack on their credibility and, thus, significantly accommodate the defendant's Sixth Amendment's constitutional guarantee of his right of confrontation, and should be encouraged. The information in this respect should be accurate and complete, so that a defendant may not be misled in the preparation of his defense through the State's inaccurate or incomplete listing of its witnesses.

Allowing an unlisted witness to testify, however, is within the discretion of the trial court and such action will not be deemed an abuse of judicial discretion in the absence of a showing of surprise or prejudice. *People v. Jordan*, 1967, 38 Ill.2d 83, 230 N.E.2d 161, 167; *State v. Coleman*, 1965, 46 N.J. 16, 214 A.2d 393, 399.

Defense counsel was undoubtedly aware that Mr. Martel was co-owner of the premises involved and that the State would most probably require his testimony to prove the non-permissive willful attempt to enter the dwelling house. His strategy paid off when he elicited from Mrs. Martel on cross-examination that she did not know as a fact that the people came up to the house were not known to her husband. There is no evidence in this record that the State's omission to list Mr. Martel as a prosecution witness was anything but an honest mistake, which in no way misled the defendant. No claim was advanced that the defendant was placed at any disadvantage by the belated knowledge that Mr. Martel was being called as a witness.

Furthermore, the opportunity for cross-examination was present and fully used. We are satisfied that the defendant did not suffer any prejudice from the State's failure to include Mr. Martel's name in the list of witnesses furnished by the State. The trial Court did not abuse its discretion in its ruling concerning the same.

### III

### *Examination of witness by Court*

On direct examination by the State, Officer Bisson was asked whether Mrs. Martel had identified one of the individuals depicted in six polaroid photographs of six different persons. Defense counsel objected on the ground that no proper foundation had been laid for the introduction of the photographs in evidence, and also, because they had not been offered as yet. The presiding Justice, then, proceeded to question the witness respecting the number of photographs shown Mrs. Martel, whether they were accurate representations of the individuals they purported to portray, whether the color rendition was true, and he brought out further the general information that some of the pictures were already in the police files. It was defense counsel, however, who, on voir-dire examination, obtained the specific disclosure that the defendant's photograph was one of the pictures that had been taken previously. When the State sought to introduce the photographs in evidence, the defendant objected to their admission on grounds other than his present contention, which is that the Justice's examination of the witness in relation to the pictures was an expression of an opinion on his part upon the ultimate issue of identification of the defendant in violation of 14 M.R.S.A., § 1105.[2]

Attorneys of persons accused of crime, whether retained or court-appointed, have the duty of protecting and preserving their clients' rights in every legitimate way. They must do so, however, in compliance with the requirements of court rules regulating trial procedures. Their failure to make known seasonably to the court their complaint about the particular conduct of the trial justice to which they object must be viewed under our Rule 51, M.R.Crim.P. as trial strategy and a waiver by the accused of any objections respecting such judicial action. *State v. Rowe,* 1968, Me., 238 A.2d 217, 225.

We have indicated on many occasions our disapproval of a trial justice assuming the posture of an advocate, for fear that his conduct be inferentially disruptive with the jury in casting an impression of partiality for one side or the other, contrary to the position of strict neutrality which the administration of justice demands. However, as we said in *State v. Haycock,* 1972, Me., 296 A.2d 489, 492:

> "Under circumstances where the defense counsel regards the intervention of the presiding Justice as exceeding permissible limits, he should immediately utilize M.R.Crim.P., Rule 51, and make known 'to the Court the action which he desires the Court to take or his objection to the action of the Court *and his grounds therefor.*'" (Emphasis added)

The defendant's present complaint against the Justice's interrogation of the one witness was not raised at the time it occurred. A review of the record satisfies us that, if error there was in connection therewith, it was not "so highly prejudicial and calculated to result in injustice that an unjust verdict would inevitably result or

2. 14 M.R.S.A. § 1105.
   "During a jury trial the presiding justice shall rule and charge the jury, orally or in writing, upon all matters of law arising in the case but shall not, during the trial, including the charge, express an opinion upon issues of fact arising in the case, and such an expression of opinion is sufficient cause for a new trial if either party aggrieved thereby and interested desires it, and the same shall be ordered accordingly by the law court on appeal in a civil or criminal case."

. . . that the accused has not had the impartial trial to which under the law he is entitled." *State v. Rowe*, supra, at 225. See also, *State v. Devoe*, 1973, Me., 301 A. 2d 541, 545.

## IV

### *Self-Incrimination*

During the direct examination of Mrs. Martel, the prosecutor sought to elicit from her, whether the individuals who had been at her house on July 30, 1974 were in the courtroom and, if so, to point them out. Thereupon, she fingered a male person who was then asked to stand and identify himself. Defense counsel objected, contending that a response to this request would be a violation of the defendant's Fifth Amendment privilege against self-incrimination. The Court overruled the objection and the individual identified himself as Frank Tullo, who happened to be the defendant on trial. Defense counsel moved for mistrial to no avail. There was no violation of the defendant's Fifth Amendment rights in this trial procedure.

The Fifth Amendment privilege of any person under the Federal Constitution not to "be compelled in any criminal case to be a witness against himself," applicable to the States through the Fourteenth Amendment, protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature. *Schmerber v. State of California*, 1966, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908, 914.

This Court has applied the *Schmerber* rule to several factual situations. In *State v. Buzynski*, 1974, Me., 330 A.2d 422, 425, 426, we said that it was clear beyond debate that an order requiring a criminal defendant to submit to a psychiatric examination in no way compels the production of testimonial evidence, since the purpose is not to extract incriminating statements, but

rather, to determine the presence, or absence, of mental disease or mental defect. In *State v. Stevens*, 1969, Me., 252 A.2d 58, this Court held the extraction of blood from the person of a criminal defendant and the use of the result of a chemical analysis of his blood as evidence at trial did not involve giving of compulsory testimonial or communicative evidence in violation of the federal constitutional privilege against self-incrimination.

In *Stevens*, supra, at page 60, we quoted with approval from *Schmerber*, supra:

"On the other hand, both federal and state courts have usually held that it [the privilege against self-incrimination] offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, *to write or speak for identification, to appear in court*, to *stand*, to assume a stance, to walk, or to, make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." (Emphasis supplied)

In *Swingle v. United States*, 1945, 10 Cir., 151 F.2d 512, the defendants were compelled over their objections to identify themselves at the commencement of the trial. The Court ruled that they were not compelled to testify against themselves within the meaning of the Fifth Amendment.

Self-identification under the California Vehicle Code which requires persons involved in an accident to stop at the scene and give their name and address was held, in a plurality opinion written by Chief Justice Burger, to be "an essentially neutral act" and not testimonial in the Fifth Amendment sense. *California v. Byers*, 1971, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed. 2d 9.

■ The constitutional guarantee against testimonial compulsion extends to communications "which would furnish a link in the chain of evidence needed to prosecute." *Hoffman v. United States,* 1951, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118; *Collett v. Bither,* 1970, Me., 262 A.2d 353, 358.

■ The purpose of compelling the defendant to identify himself at trial was not to extract an incriminating statement from him, but only to determine the presence or absence of the rightful person standing trial. The defendant was not identifying himself as the person who had committed the offense charged against him. The prohibition against compelling an accused person to be a witness against himself is a restraint against the use of physical or moral compulsion to extort communications from him, but should not be used as a shield of his body against identification, either at arraignment or at trial, at which time the person of the accused may serve as the source of real or physical evidence.

■ The reference trial procedure compelling the accused to stand and disclose his identity by speaking his name in the course of a trial for the purpose of permitting a witness to shed light upon the identity of the accused with the person who actually committed the crime charged is not significantly different from compelling a criminal defendant to write or speak, to assume a stance, to walk or make a particular gesture for the same purpose. None is violative of Fifth Amendment rights.

The entry will be

Appeal denied.

DELAHANTY, J., did not sit.

All Justices concurring.