**UNITED STATES of America**

v.

**David Keith HENSEL et al.**

**Crim. No. 80–00030 P.**

United States District Court,
D. Maine.

March 23, 1981.

Thomas E. Delahanty, II, U. S. Atty., Margaret D. McGaughey, Asst. U. S. Atty., Portland, Me., for plaintiff United States of America.

John P. Ward, Michael Avery, Boston, Mass., for defendant David K. Hensel.

Jack H. Simmons, Lewiston, Me., for defendant Gerald W. Case.

Marshall A. Stern, Bangor, Me., for defendant Craig L. Dill.

Theodore K. Hoch, Bath, Me., for defendant John T. Downing.

Edward T. M. Garland, Atlanta, Ga., Joseph M. Hochadel, Portland, Me., for defendant Larry R. Duke.

Peter J. Rubin, Portland, Me., for defendant Robert C. Hubbard.

Peter J. DeTroy, III, Mark G. Lavoie, Portland, Me., for defendant William Storey.

David C. Pomeroy, Portland, Me., for defendant Charles T. Standley.

William P. Hardy, Lewiston, Me., Mark J. Kadish, Atlanta, Ga., for defendant John J. Wells.

## MEMORANDUM OF OPINION AND ORDER ON DEFENDANTS' MOTION TO SUPPRESS

GIGNOUX, Chief Judge.

Nine defendants are charged in a one-count indictment with conspiracy to possess with intent to distribute and to import into the United States approximately 18.7 tons of marijuana, in violation of 21 U.S.C. §§ 846 and 963. Presently before the Court is the motion to suppress evidence filed by all defendants, other than defendant David Keith Hensel, pursuant to Fed.R.Crim.P. 12(b)(3) and 41.[1] An evidentiary hearing has been held, the issues have been comprehensively briefed and argued by counsel, and the following memorandum opinion contains the Court's findings of fact and conclusions of law as required by Fed.R. Crim.P. 12(e).

## I

## THE FACTS

### A. The Preliminary Investigation of Turkey Cove

The investigation that led to the instant indictment began in late April 1980. At that time agents of the Drug Enforcement Administration (DEA) and the Maine State Police (MSP) Anti-Smuggling Unit received information that on April 24, an individual using the name of James T. Duke of Roswell, Cobb County, Georgia, had purchased Lot # 3, in the Turkey Cove subdivision, Tenant's Harbor, Maine, for $170,000 in cash. Subsequent investigation disclosed that Lot # 3 consisted of 2.89 acres of wooded land in a secluded area on the St. George River on the Maine coast. On it were three wood frame buildings, a wooded

---

1. Two motions to suppress filed by defendant Hensel are the subject of a separate opinion.

garage, and a deepwater dock with direct access to the Atlantic Ocean. Access to the Turkey Cove subdivision is by a dirt road extending from the Glenmere Road, a public highway leading to Thomaston, approximately 20 miles away.

In late April the agents also learned that on April 7 defendant Craig Lee Dill, using the name R. C. Hubbard, had purchased the vessel SUNSHINE, a 32-foot Pacemaker sport fishing vessel, from Northeast Marine Brokers in East Boothbay, Maine. The purchaser made a $3,000 deposit with a bank check and paid the remainder of the purchase price on April 10 with three bank checks totaling $30,000. Thereafter, $8,000 worth of electronics equipment, including a Loran C finder, a marine VHF radio and a CB radio, was installed on the SUNSHINE. On April 26, Dill and one Fred Bauer told employees of Northeast Marine Brokers that they were taking the SUNSHINE to Massachusetts. Instead, agents observed the boat being taken to Turkey Cove. A check of the El Paso Information Center (EPIC) computer revealed that in 1974 Dill had been arrested and convicted in Venezuela for possession of 2½ kilograms of cocaine and had received a four-year prison sentence.

As a result of the foregoing information, DEA and MSP agents instituted surveillance of the Turkey Cove property. Outlooks were set up on adjacent properties, and an observation post was established across the St. George River, approximately three-fourths of a mile away. Aerial surveillance was also conducted two to three times a week, and some photographs were taken, both ground and aerial. The surveilling officers at the observation post used nonmagnifying nightscopes at night, and a spotting scope, a telescope and binoculars during the day. With these visual aids, the agents could see persons and vehicles on Lot # 3, and any vessel moored at the dock, but they could not observe activities inside the buildings or identify the individuals observed.

During the month of May, the surveilling officers observed the SUNSHINE making numerous trips out toward the open ocean. The boat would leave late in the afternoon and return late at night, frequently without navigational lights. Once, during a surveillance flight, they observed the SUNSHINE lying idle in the water off the coast, apparently not engaged in any activity.

The agents also observed a number of vehicles come and go from Lot # 3. Five Pennsylvania vans registered to the same owner and two Georgia vans, all with substantial cargo capacity, were seen on the premises at various times. A tan pickup truck without a cover was also observed during a surveillance flight. A number of different persons were seen visiting and working around the property. Toward the end of May, persons were observed strengthening the dock and constructing a plywood platform on it. Some of the work took place at night, by flashlight. A man fitting the description of defendant Charles Thad Standley, who had been observed doing carpentry work around the dock, was seen at a restaurant in Thomaston with other individuals and vehicles which had been on the premises.

On May 30–31, MSP Sgt. Harry Bailey followed eight hi-cube vans, each with a large cargo area, from Thomaston to the Ramada Inn in Lewiston. Three of them, a red van with temporary Pennsylvania plates, and two vans with Georgia registrations, had been seen on Glenmere Road near the access road to Lot # 3. The drivers of several of the vans checked into the Ramada Inn, indicating that they planned to stay until June 3. Two days later, on June 2, investigating agents learned that the drivers had unexpectedly checked out of the motel. A white GMC step van WY 3943 was the only one of the eight vans that remained behind.

B. *The Arrival of the PATRICIA in the Gulf of Maine*

On May 30, Special Agent Edward Drinan of the DEA, who with Sgt. Bailey was in charge of the Turkey Cove investigation, received a report from the United States Coast Guard (USCG) Operations Center in

Boston. A large vessel, the M/V PATRICIA, had been seen by a commercial fishing vessel, the J. BRADLEY O'HARA, hovering off the Maine coast in the Sewell Ridge area approximately 90 miles southeast of Rockland. One white male, later identified as defendant Hensel, and several black men were on board. The white man had informed the O'HARA boat that his radio was inoperative and had requested the O'HARA captain to call three land line telephone numbers. Instead of placing the calls, the O'HARA captain had notified the USCG Operations Center, relaying the telephone numbers. An EPIC check revealed that a vessel named PATRICIA was suspected of drug smuggling.[2] DEA investigation also disclosed that two of the telephone numbers the PATRICIA had asked the O'HARA boat to call were to exchanges in Florida listed to suspected drug smugglers. The third telephone number was to an exchange in Cobbtown, Georgia, but the identity of the subscriber could not be determined at that time. The USCG Operations Center also informed Drinan that when a Coast Guard rescue aircraft arrived at the scene, the PATRICIA, although it had been reported disabled, had started up under its own power and was proceeding northeasterly toward the Nova Scotia coast. The vessel was being pursued by American and Canadian aircraft and a Coast Guard cutter.

Agent Drinan, anticipating a possible link between the PATRICIA and the Turkey Cove investigation, was in continual contact with the USCG Operations Center and the Drug Division of the Royal Canadian Mounted Police (RCMP) regarding the 24-hour high seas chase of the PATRICIA on May 30–31 and the interrogation of defendant Hensel by the RCMP on June 1.[3] On May 31, he received word shortly before noon that the PATRICIA had been boarded

and seized by the Canadians that morning; that approximately 19 tons of marijuana had been found on board; and that Hensel had been arrested by the RCMP. On June 1, he was informed of the results of Hensel's interrogation by the Canadian officers and that Hensel had told the Canadians his cargo had been destined for "the States."

## C. The Events of the Night of June 2–3

At approximately 11:30 p. m. on the night of June 2, MSP Trooper Michael Roux, on duty at the observation post across the St. George River, saw the SUNSHINE, which had set out toward the open sea during the afternoon, returning to the Turkey Cove dock accompanied by a larger 60 to 70-foot vessel.[4] Believing that this might be the marijuana boat the officers were expecting, Roux notified MSP Cpl. David Sinclair at the Thomaston State Police Barracks, who in turn notified DEA Special Agent Michael Cunniff. Cunniff and Sinclair met at the command post near Turkey Cove with other members of the surveillance team, and it was decided that Cunniff and Sinclair would scout the Turkey Cove property on foot.

At approximately 12:30 a. m. on June 3, Cunniff and Sinclair made their way along the Turkey Cove access road and through the woods on property adjacent to Lot # 3 to the beach. They then continued along the rocky beach below the high water mark to a point where fallen timber and debris blocked their passage. Cunniff remained behind while Sinclair waded through the waist-deep water around the debris and continued on the beach to a point where he could observe the dock. The time was approximately 2:30 a. m. Sinclair observed persons leaving the compound to board the large boat, but saw no offloading activity. At 2:58 a. m., he observed the large boat leave the dock.

---

2. It was learned afterward that the EPIC report related to another vessel of similar description, also named PATRICIA, and not to the vessel in Sewell Ridge on May 30.

3. The details of the pursuit, boarding and search of the PATRICIA, and the RCMP interrogation of Hensel are recounted in the Court's

separate opinion on Hensel's motions to suppress. They will not be repeated here.

4. It was learned the next day that the larger vessel had towed the SUNSHINE to the dock because it had run aground.

Cunniff, after waiting 20 minutes, also waded through the water around the debris and joined Sinclair at approximately 3:20 a. m. On learning that the larger vessel had departed, Cunniff suspected that its arrival might have been a "dry run."

Instead of returning by the same route they had taken to arrive at the dock, which would have necessitated again wading through the water around the debris,[5] Cunniff and Sinclair decided to take what they believed to be the most direct route out to Glenmere Road, across Lot # 3.[6] They climbed onto the dock and walked along the driveway on Lot # 3 to the common access road and thence to Glenmere Road. While on the driveway they passed a tan Jeep parked in the rear of the cookhouse. Cunniff recorded the license plate, Georgia registration QP 2331.

Later that night, the agents learned through a check of the license number that the tan Jeep was registered to defendant John J. Wells of Cobbtown, Georgia. Linking Wells' Cobbtown address with the as yet unidentified Cobbtown telephone number which the PATRICIA had reportedly asked the O'HARA boat to call, Drinan acquired Wells' Cobbtown telephone number and contacted the Coast Guard to verify the accuracy of the telephone number which had been relayed from the PATRICIA. He found that the last two digits had been transposed and that the correct number matched Wells' telephone number. For the first time, the connection between the PATRICIA and the Turkey Cove investigation had been made.

D. *The Highway Stop of the Georgia Jeep and the Arrests of Defendants Case and Hubbard*

By approximately 4:30 p. m. on June 3, the surveilling agents had learned that Hensel had been deported from Canada and arrested by Drinan at the Logan Airport in East Boston. At approximately 5:15 p. m. Drinan informed Cunniff by telephone that Hensel, in Drinan's presence, had telephoned a Boston attorney at the airport and instructed him to call a female lawyer in Philadelphia, who "would know who to call and know what to do." As a result, Cunniff instructed DEA Special Agent Wayne Steadman to arrange with the United States Attorney's office in Portland for a warrant to search the Turkey Cove premises. At approximately 6:45 p. m., Cunniff learned by radio that the warrant was expected to issue within the next 45 minutes. Apprehensive that word of the seizure of the PATRICIA and the arrest of Hensel might have reached Turkey Cove, Cunniff and other agents made their way to the vicinity in order to prevent anyone from leaving Lot # 3 before the warrant was issued. At approximately 7:00 p. m., they saw smoke rising from one of the houses, suggesting that someone was still there.

Cunniff took up a position on Glenmere Road near the access road to Turkey Cove. At approximately 7:15 p. m., he saw the Jeep with Georgia registration QP 2331 registered to defendant Wells leave the access road and turn toward Thomaston on Glenmere Road. Cunniff followed the vehicle and signaled it to stop.

The driver of the Jeep, defendant Gerald Wayne Case, got out and walked to the rear of the Jeep toward Cunniff. He held out a wallet to display his license and asked if something was wrong. Cunniff identified himself as a narcotics agent, displayed his credentials, and stated that he would explain in a minute why he stopped the Jeep. He recognized Case as a person seen with defendant William Storey at a restaurant in Thomaston. Through the rear window of the Jeep, Cunniff noticed defendant Robert Curtis Hubbard crouched in the passenger seat as if hiding something. Exposed in the

---

5. The parties have stipulated that high tide occurred at 2:17 a. m. on June 3, with a rise of 9.6 feet.

6. The evidence indicated that the officers could have continued easterly along the beach to Glenmere Road. The Court, however, accepts the testimony of the agents that they were unfamiliar with the area and that they were not aware of this alternative means of egress.

bed of the Jeep Cunniff also observed luggage, several green garbage bags, a canoe, and a long metal pipe with a red flag at the end which was attached to a bamboo pole.

Leaving Case standing between the agent's car and the Jeep, Cunniff opened the driver's side door of the Jeep and asked Hubbard to step out. Simultaneously, he saw a 12-volt battery on the floor in front of the passenger seat and a CB radio with a power cable connected to the battery and to an antenna. As Hubbard was getting out of the Jeep, Cunniff saw some paper protruding from underneath the driver's seat. He reached for it and felt a gun, later found to be a loaded .357 magnum Ruger pistol, and a folded document. He moved both items forward, but did not remove them, in an effort to prevent the defendants from learning of their discovery.

Hubbard identified himself as R. C. Hubbard. Cunniff recognized the name as that used by defendant Dill to purchase the SUNSHINE. By then, two state troopers had arrived. Cunniff advised both defendants of their *Miranda* rights. Both defendants declined to answer any questions. Cunniff then asked Case if anyone else was still on the Turkey Cove property. Case thought for a moment, then replied no. Cunniff placed both men under arrest for conspiracy to violate the federal narcotics laws. During a pat down, their personal property was removed. The defendants were then taken by the two state troopers to the Knox County Sheriff's office, where they were booked.

Cunniff then returned to the Jeep, where he retrieved the document and the gun from underneath the driver's seat. He found that the document was a navigational chart of the east coast of the United States. Penned onto it was a line, marking day and time positions in a progression up the Atlantic coast from the southern United States, to a position off the coast of Maine, and then toward Nova Scotia. The Jeep and its contents were not searched until search warrants were later obtained. The Jeep was eventually taken to Turkey Cove for safekeeping.

### E. *The Assault on Lot # 3 and the Arrests of Defendants Storey, Standley, Duke and Downing*

After the stop of the Jeep, Cunniff and Bailey made the decision to move in on the Turkey Cove property in accordance with the prearranged plan which had been developed by the officers. They were apprehensive that those persons remaining on the property had been informed of Hensel's arrest and had been alerted to the officers' presence by Case and Hubbard on the CB radio in the Jeep. Fearing that evidence would be destroyed or other conspirators would flee before the search warrant arrived, Cunniff and nine officers made their way down the road to Lot # 3 to secure it until authority to search was received, and to arrest anyone found there. MSP Troopers Roux and Michael Vittum drove directly to the boathouse. There they encountered defendants Storey and Standley, who appeared to have been walking from the boathouse to the main house. Roux stopped them at the corner of the boathouse underneath the overhang. The officers identified themselves, and placed both defendants under arrest for conspiracy to possess narcotics. They were advised of their *Miranda* rights, which they indicated they understood. Having been instructed to keep note of time, Roux looked at his watch and wrote down that Standley's arrest occurred at 7:45 p. m. and Storey's at 7:46 p. m.

Roux and other officers then made a cursory search of the boathouse, looking in closets and under beds for other conspirators. They found none.

In the meantime, Cunniff and Bailey had gone briefly toward the cookhouse and then to the main house. The lights were on and loud music was playing. Cunniff knocked on the front door, called out that it was the police, and, when no one responded, opened the unlocked door. The two officers entered the house and separated.

Cunniff checked each of the rooms along the corridor, looking behind beds for anyone who might have been hiding.

Bailey proceeded to the living room, where he found defendant Downing seated on a couch examining nautical charts. Bailey motioned to Cunniff, who identified himself and placed Downing under arrest. Cunniff then resumed his tour of the house, while Bailey informed Downing of his *Miranda* rights. Having indicated that he understood them and was willing to talk, Downing told Bailey he had recently flown into Augusta for a visit with a friend. When Bailey asked the friend's name, Downing said he wanted a lawyer before talking further.

Cunniff proceeded upstairs where he encountered defendant Duke sitting at a desk in the master bedroom writing on a yellow pad. Cunniff saw an open briefcase nearby with a large amount of money in it, an amount later determined to be $44,000. Another yellow pad and what proved to be $2,000 cash were lying on the desk. Cunniff called out to Duke several times, but Duke appeared not to hear him.[7] When Cunniff did make himself heard, he identified himself to Duke and placed him under arrest. The time was about 7:45 p. m. Cunniff then read Duke his *Miranda* rights. Duke indicated he understood. He requested a lawyer and refused to answer questions, but expressed concern for the cash, which he said belonged to his father. Cunniff asked Duke if there were any weapons in the area, and Duke indicated that there was an old shotgun in the closet. No other evidence was seized or examined at the time, although Cunniff picked up the $2,000 and the yellow pads Duke had been writing on and put them in the briefcase.

Leaving an officer with Duke, Cunniff checked the rest of the house and found it otherwise unoccupied. He then left the house to make sure that the other officers were safe and had completed their assignments.

In the meantime, at approximately 7:00 p. m., Agent Steadman had arrived with the warrant application at the Falmouth residence of the United States Magistrate. At 7:45 p. m., the Magistrate signed the warrant, recording the time on the document. Steadman notified the MSP Augusta and Scarborough Barracks that the warrant had issued, and set out with the warrant for Turkey Cove. Approximately 15 minutes after entering the house, Cunniff learned that Steadman was on his way with the warrant. Cunniff instructed the other officers not to conduct any search until Steadman actually arrived with the warrant in hand.

While waiting for Steadman's arrival, the officers seized and secured the SUNSHINE, which was moored at the dock. Three vehicles parked in the driveway in front of the main house were also seized and secured: a 1979 Chevrolet van with Georgia registration WW 9679, a 1980 Toyota Celica with Georgia registration NEJ 374, and a 1966 Chevrolet van with Oregon registration FBW 950. The SUNSHINE and the vehicles were not searched at that time.

The four defendants found on the premises were removed to the cookhouse for processing. After stating that no questions need be answered, Customs Officer Paul Flaherty took down Downing's personal history. Upon request, Downing emptied his pockets and surrendered various articles, including some keys. Flaherty asked what the keys were for, and Downing said they were to a Cessna airplane he owned, which was parked at the Owl's Head Airport at Rockland. Flaherty informed Cunniff, who asked Downing if he would consent to a search of the plane. Downing said he first wanted to consult a lawyer.

At approximately 10:00 p. m., Steadman arrived with the search warrant. At that time, the buildings were searched and evidence was seized. The charts Downing had been studying at the time of his arrest were examined, as were the yellow pads on which Duke had been working. The latter proved to be a payroll list, a list entitled "clean-up crew," and other notes and instructions.

### E. *The Seizure of Downing's Cessna Airplane*

When the searches at Turkey Cove had been completed, Cunniff and Bailey went to

---

**7.** Duke testified that he had a hearing impairment.

the Owl's Head Airport to impound Downing's Cessna airplane until a warrant could be procured. They did not enter the plane, which was locked. They then arranged for a State pilot to fly the plane to Augusta on June 4. When the pilot arrived at Owl's Head, he was advised by airport personnel that the owner of the plane would fly in bad weather when he should not, and would fly out toward the ocean for an hour or so before returning. The pilot then flew the plane to Augusta where it was impounded. The plane was not searched until a warrant was obtained.

### F. The Warrant Searches

On June 5, warrants were obtained to search the SUNSHINE, the tan Jeep, the three Turkey Cove vehicles, and the Cessna airplane. Warrants were also obtained to search three suitcases, two Samsonite briefcases, and four garbage bags found in the tan Jeep which Case and Hubbard had been driving. Finally, a warrant was obtained to search the van seen at the Ramada Inn in Lewiston, which had evidently been abandoned. The warrants were executed the same day.[8]

## II

### THE LAW

Defendants seek to suppress all the evidence obtained directly or indirectly from the foregoing searches and seizures, on the ground that the evidence was obtained in violation of their Fourth Amendment rights. In addition, defendants Case and Downing seek suppression of statements made by them, together with the fruits of

---

**8.** Defendants Dill and Wells surrendered following the return of the indictment on June 12.

**9.** At the suppression hearing defendants appeared also to challenge the agents' use of binoculars and telescopes during the day and nightscopes at night to observe the activities at Turkey Cove from the observation post across the St. George River. Defendants apparently have now waived this argument. In any event, it is clear that the use of such visual aids transgresses no Fourth Amendment rights. See United States v. Moore, 562 F.2d 106, 112 (1st Cir.), cert. denied, 435 U.S. 926, 98 S.Ct.

---

such statements, because the statements are inadmissible under the doctrine of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ Defendants' Fourth Amendment challenges focus on: (1) Agent Cunniff's observation of the license number on the Georgia Jeep during his warrantless entry onto Lot # 3 on the night of June 2–3; (2) Cunniff's warrantless stop and search of the Georgia Jeep and arrest of Case and Hubbard on the evening of June 3; (3) the officers' warrantless entry and search of Lot # 3, seizure of the SUNSHINE and the vehicles found there, and arrest of Storey, Standley, Duke and Downing; and (4) allegedly false statements and material omissions in Steadman's affidavit in support of the search warrant for Lot # 3.[9] Defendants Case and Downing assert that their Fifth Amendment rights were violated because the officers continued to question them after they had been given Miranda warnings and had invoked their right to remain silent.

The Court first will consider which, if any, of the defendants have standing to raise their various challenges. The Court then will treat separately each of defendants' contentions.

### A. The Defendants' Standing

■ In order to contest a search or seizure on Fourth Amendment grounds, a defendant has the burden of establishing that he had a legitimate and reasonable expectation of privacy in the premises searched or the property seized. Rawlings v. Kentucky, 448 U.S. 98, 104–105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); Rakas v.

---

1493, 55 L.Ed.2d 521 (1977); United States v. Allen, 633 F.2d 1282 (9th Cir. 1980); United States v. Dubrofsky, 581 F.2d 208, 211 (9th Cir. 1978); Fullbright v. United States, 392 F.2d 432, 434 (10th Cir.), cert. denied, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968). See also United States v. Balsamo, 468 F.Supp. 1363, 1371 n.8 (D.Me.1979). Unlike United States v. Taborda, 635 F.2d 131 (2d Cir. 1980), the agents in the present case had observed activities on the dock, but could not see into the buildings.

*Illinois*, 439 U.S. 128, 130–31 n.1, 139, 148–49, 99 S.Ct. 421, 423 n.1, 433, 58 L.Ed.2d 387 (1978). *See United States v. Salvucci*, 448 U.S. 83, 91, 93, 100 S.Ct. 2547, 2552 and n.6, 2554 n.7, 65 L.Ed.2d 619 (1980). Although all the defendants have joined in a single omnibus motion to suppress, not all have the requisite standing to raise Fourth Amendment objections to each of the searches and seizures of which they complain. Fourth Amendment rights may not be vicariously asserted. *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969). Like Fourth Amendment rights, Fifth Amendment rights also are personal and may not be vicariously asserted. *Couch v. United States*, 409 U.S. 322, 328–29, 93 S.Ct. 611, 615, 34 L.Ed.2d 548 (1973). *See Fisher v. United States*, 425 U.S. 391, 398–401, 96 S.Ct. 1569, 1574, 48 L.Ed.2d 39 (1976).

Applying the foregoing principles, the Court concludes that no defendant has standing to challenge Agent Cunniff's observation of the license plate of the Georgia Jeep parked on the driveway of Lot # 3 on the night of June 2–3; that only defendants Case and Hubbard have standing to contest Cunniff's stop and search of the Georgia Jeep on the evening of June 3; that only defendants Storey, Standley, Duke and Downing have standing to object to the officers' entry into and search of Lot # 3 on the night of June 3; that no defendant, other than Downing (the owner of the Cessna airplane), Standley (the owner of the orange leather travel bag found in a garbage bag), Duke (the owner of the tan canvas suitcase found in another garbage bag), and Case (the owner of the brown Samsonite briefcase), has standing to challenge the warrant searches of the vessel SUNSHINE, the Cessna airplane, the five vehicles, the five pieces of luggage, and the four garbage bags; and that only defendants Case and Downing have standing to seek suppression of the statements made by them.[10]

**B. *Agent Cunniff's Entry Onto Lot # 3 on the Night of June 2–3***

 Defendants contend that Agent Cunniff's identification of the license number of the Georgia Jeep during his warrantless entry onto the driveway of Lot # 3 in the early morning of June 3 violated their Fourth Amendment rights. They argue that the entry by Cunniff and Sinclair on the beach and on the premises themselves constituted a trespass, and since the officers had no right to be on Lot # 3, their observations on the premises and the fruits thereof must be suppressed. The Court disagrees.

For present purposes, it may be conceded that the officers' entry on the beach and on the property constituted a common-law trespass. *See State v. Tullo*, 366 A.2d 843, 847 (Me.1976); *State v. Crider*, 341 A.2d 1, 5 (Me.1975).[11] The fatal flaw in defendants'

---

**10.** Defendant Dill concedes that he is without standing to challenge the searches and seizures that are the subject of the present motion.

**11.** Clearly, however, no defendant could have had any reasonable expectation of privacy in the beach. Defendants' own expert testified that, regardless of title, tidal flats are subject to the *jus publicum*. *See State v. Wilson*, 42 Me. 9, 20, 24 (1856). Plainly, a beach in Maine comes under the "open field" exception to the Fourth Amendment protection. *See Hester v. United States*, 265 U.S. 57, 59 (1924); *Basile v. United States*, 569 F.2d 1053, 1056 (9th Cir.), *cert. denied*, 436 U.S. 920, 98 S.Ct. 2268, 56 L.Ed.2d 761 (1978); *United States v. Brown*, 473 F.2d 952, 954 (5th Cir. 1973). *See also* 1 W. LaFave, *Search and Seizure* § 2.4(a) (1978).

Neither could a defendant have had a reasonable expectation of privacy in the driveway upon which Cunniff and Sinclair were proceeding in this case. Although the section of the driveway on which the Jeep was parked was undoubtedly within the curtilage of Lot # 3, *see Rosencranz v. United States*, 356 F.2d 310, 313 (1st Cir. 1966), the reach of the Fourth Amendment does not turn upon "the presence or absence of a physical intrusion into any given enclosure." *Katz v. United States*, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967). *See also United States v. Salvucci, supra*, 448 U.S. at 90, 100 S.Ct. at 2552; *Rawlings v. Kentucky, supra*, 448 U.S. at 103, 100 S.Ct. at 2560. Even a residence driveway, which is freely accessible to visitors, tradesmen and any lost traveler, is but a semi-private area in which one cannot reasonably expect privacy.

challenge, however, is that no defendant, even defendant Wells who was the owner of the Jeep, has demonstrated that he had a reasonable expectation of privacy in the license number of the Jeep. The purpose of States requiring the owners of motor vehicles to display license plates is to enable law enforcement officers to see them and to identify the vehicle and its owner. *See* 29 Me.Rev.Stat.Ann. § 381; 68 Ga.Code Ann. § 201. The Jeep certainly had been driven over public roads to reach the Turkey Cove property. It was parked on the driveway open to the view of tradesmen and others who visited the property. "What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).[12]

No Fourth Amendment right of any defendant was violated by Agent Cunniff's entry onto Lot # 3 and his observation of the license plate on the Georgia Jeep.

#### C. Agent Cunniff's Stop and Search of the Georgia Jeep—The Arrest of Defendants Case and Hubbard

Defendants contend that Agent Cunniff's warrantless highway stop and search of the Georgia Jeep and arrest of defendants Case and Hubbard on the evening of June 3 violated their Fourth Amendment rights. They argue that there was no "founded suspicion" on which an investigatory stop of the Jeep could lawfully be made and that there was no probable cause for the subsequent search of the vehicle and the two arrests. In addition, Case contends that the

statement made by him to Cunniff after his arrest must be suppressed under the doctrine of *Miranda v. Arizona, supra.* The Court finds no merit in defendants' contentions that the stop and subsequent search and arrests violated the Fourth Amendment, but the Court agrees, as the government apparently concedes, that Case's statement to Cunniff must be excluded from evidence at trial as against that defendant.

■ Only Case and Hubbard were present in the Jeep when it was stopped by Cunniff. For purposes of the present ruling, the Court will assume that both have standing to object to the stop and search of the vehicle. *See Rakas v. Illinois, supra* 439 U.S. at 154–55, 99 S.Ct. at 436 (Powell, J., concurring), 160 n.5 (White, J., dissenting). *But see id.* at 148–49, 99 S.Ct. at 433. No other defendant has standing to object to the stop or the search of the Jeep. *Id.* at 133–34, 99 S.Ct. at 425.[13]

#### 1. The Stop

■ The law governing the constitutional validity of an investigatory stop is undisputed. In *United States v. Brignoni-Ponce,* 422 U.S. 873, 878–81, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975), the Supreme Court made clear that a stop of a moving vehicle involves a "seizure" within the meaning of the Fourth Amendment, even if the period of detention is short. *See Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Because of the limited nature of the intru-

---

*United States v. Magana,* 512 F.2d 1169, 1170–71 (9th Cir. 1975). *See United States v. Balsamo, supra* note 9 at 1379. *See also* 1 W. LaFave, *supra,* § 2.3(f) at 322–23 & n.149.

**12.** Under *Rakas,* a defendant's subjective expectation of privacy is not controlling; his expectation of privacy must be objectively reasonable. *Rakas v. Illinois, supra* 439 U.S. at 143, 99 S.Ct. at 430; *Smith v. Maryland,* 442 U.S. 735, 740–41, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

**13.** Defendant Wells, the owner of the Jeep, was not present. He had relinquished control of the vehicle to Duke, who had given it to Case and Hubbard. Wells therefore could have had no

reasonable expectation of privacy which would give him standing to object to the stop and search. *See United States v. Dall,* 608 F.2d 910, 915 (1st Cir. 1979). Other defendants claimed to own luggage in the Jeep. Even if they did own those items, that fact does not confer standing to challenge the search. They could have had no reasonable expectation of privacy in the cab and uncovered bed of a pickup truck under the control of other persons. *See Rawlings v. Kentucky, supra,* 448 U.S. at 105–106, 100 S.Ct. at 2562. None of the luggage was opened or searched before warrants were obtained.

sion, however, the Court held that such stops may be justified without a showing of probable cause. *United States v. Brignoni-Ponce, supra* 422 U.S. at 880, 95 S.Ct. at 2579; *see Terry v. Ohio, supra* 392 U.S. at 20–22, 88 S.Ct. at 1879. As this Court observed in *United States v. Balsamo, supra* at 1384, the principle that has evolved from *Brignoni-Ponce* is that "a vehicle may be stopped for questioning of the occupants when an officer has specific articulable facts which, taken together with rational inferences from those facts, reasonably warrant suspicion of criminal conduct on the part of the occupants." Given specific and articulable facts, the investigating officer may question the driver and passengers about their identities and even ask that they explain suspicious circumstances. *United States v. Brignoni-Ponce, supra* 422 U.S. at 881–82, 95 S.Ct. at 2580; *Adams v. Williams, supra* 407 U.S. at 145–46, 92 S.Ct. at 1922.

Applying the foregoing principles, it is beyond question that Cunniff had specific and articulable facts justifying the stop of the Jeep. By the evening of June 3, numerous facts were known to Cunniff which indicated that Lot # 3 at Turkey Cove was the base for a drug smuggling operation.[14] The property was located in a secluded area with a deepwater dock and direct access to the Atlantic Ocean. It had been recently purchased for a substantial cash sum by a man from Georgia. The vessel SUNSHINE located on the property had also been recently purchased by an individual who had been convicted in Venezuela for possession of cocaine. A number of pickup trucks with substantial cargo capacities, a type known by the officers to be used by drug smugglers, two of which had Georgia registrations, had been observed on the property. During the month of May, the SUNSHINE had made frequent trips out toward the ocean, and construction activity had been observed on the dock. Cunniff had been informed of the pursuit and seizure of the

PATRICIA with approximately 19 tons of marijuana in its hold. He was also aware that one of the telephone numbers the captain of the PATRICIA had asked the O'HARA boat to call was listed to defendant Wells, the owner of the Jeep. Finally, Cunniff had received word that very afternoon that Hensel had been arrested upon his arrival at Logan Airport in Boston and had requested a Boston attorney to call a lawyer in Philadelphia who "would know who to call and know what to do."

Indeed, the totality of these facts and circumstances, known to experienced agents familiar with the methods employed by drug smugglers, established not only reasonable suspicion but more than adequate probable cause to believe that Case and Hubbard had been engaged in a drug smuggling conspiracy and were fleeing the intended site of a marijuana unloading in order to avoid being apprehended. These specific and articulable facts gave Cunniff ample grounds to stop and question the occupants of the Jeep. The stop was clearly justified under the standards set forth above.

### 2. The Search and Arrests

The circumstances which justified the stop of the Jeep also furnished probable cause for the search of the vehicle and the arrest of the two occupants. Moreover, in addition to the facts summarized above which justified the stop, Cunniff obtained additional information following the stop and his initial questioning of Case and Hubbard. He recognized Case as a person seen with the defendant Storey at a restaurant in Thomaston. Similarly, when Hubbard identified himself, Cunniff recognized the name as that used by defendant Dill, a suspected drug smuggler, to purchase the vessel SUNSHINE. The bed of the Jeep was loaded with what appeared to be the occupants' personal belongings. Finally, a loaded weapon was found concealed in the

---

14. It is the collective information of all the officers involved in an investigation that is to be considered in assessing the propriety of a stop. *Whiteley v. Warden*, 401 U.S. 560, 568,

91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971); *United States v. Hilton*, 469 F.Supp. 94, 109 (D.Me.1979), *aff'd*, 619 F.2d 127 (1st Cir. 1980).

cab. These facts provided Cunniff with additional cause reasonably to believe that the two occupants were engaged in a drug smuggling conspiracy. Probable cause having been present, a warrantless seizure and search of the vehicle was permissible under the automobile exception to the warrant requirement. *Chambers v. Maroney,* ·399 U.S. 42, 48, 90 S.Ct. 1975, 1979, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 149, 45 S.Ct. 280, 283, 69 L.Ed. 543 (1924).[15] The same facts that established probable cause to search the Jeep also provided probable cause for the arrest of its two occupants. No arrest warrant was required. *United States v. Watson,* 423 U.S. 411, 414–24, 96 S.Ct. 820, 823, 46 L.Ed.2d 598 (1976); *United States v. Vargas,* 633 F.2d 891 (1st Cir. 1980).

No defendant's Fourth Amendment rights were violated by Agent Cunniff's stop and search of the Georgia Jeep and his arrest of defendants Case and Hubbard.

### 3. *Case's Statement to Agent Cunniff*

■ The government concedes that defendant Case had asserted his constitutional right to remain silent when Agent Cunniff asked him if anyone remained on the Turkey Cove property. Accordingly, Case's response to Cunniff's inquiry must be suppressed as to him. *Miranda v. Arizona, supra* 384 U.S. at 473–74, 86 S.Ct. at 1627.

Defendant Case's post-arrest statement to Agent Cunniff is inadmissible as against that defendant at trial.[16]

### D. *The Assault on Lot # 3—The Arrest of Defendants Storey, Standley, Duke and Downing*

Defendants contend that the officers' warrantless [17] entry onto and search of Lot # 3, the seizure of the vessel SUNSHINE and the vehicles found on the premises, and the arrests of defendants Storey, Standley, Duke and Downing were constitutionally impermissible because of the absence of probable cause and exigent circumstances. *See, e. g., Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564 (1971); *Vale v. Louisiana,* 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970). The Court disagrees.

■ For purposes of the present ruling, the Court will assume that the four defendants who were present on the premises at the time of the raid—Storey, Standley, Duke and Downing—have standing to object to the officers' entry onto the property and the search of the buildings. *See Rakas v. Illinois, supra* 439 U.S. at 148–49, 99 S.Ct. at 433. *See also* 3 LaFave, *supra* § 11.3(b). The other defendants, none of whom were present or claimed a proprietary or possessory interest in the premises, do not have standing to object to the entry and search. *Rakas v. Illinois, supra; Brown v. United States,* 411 U.S. 223, 229, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973). Similarly, only the defendant arrested may attack the con-

---

**15.** In addition, the seizure and search of the Jeep were also authorized under 21 U.S.C. § 881(a)(4), (b)(4), which permit a vehicle to be seized and searched without a warrant when probable cause exists to believe that it was intended for use in transporting or facilitating the transportation of contraband. *See United States v. Pappas,* 613 F.2d 324, 326–30 (1st Cir. 1979); *United States v. Johnson,* 572 F.2d 227, 234 (9th Cir. 1978). *See also United States v. One 1972 Chevrolet Nova,* 560 F.2d 464, 469–70 (1st Cir. 1977); *United States v. Balsamo, supra* at 1381. The Jeep's large cargo capacity and its presence at an apparent marijuana off-loading site, made it reasonable to believe that the Jeep had been intended to be used to transport the contraband after it had been delivered.

**16.** Case is the only defendant who has standing to contest the admissibility under *Miranda* of

the statement made by him. His response is properly admissible against the other defendants. *See Rakas v. Illinois, supra* 439 U.S. at 140 & n.8, 99 S.Ct. at 428 n.8, 429; *Couch v. United States, supra* 409 U.S. at 327–29, 93 S.Ct. at 615; *United States v. Balsamo, supra* at 1383 n.28. Moreover, because the other defendants may not challenge the primary conduct, they may not claim that it tainted any subsequent events. *See United States v. Galvez,* 465 F.2d 681, 684 (10th Cir. 1972).

**17.** The search warrant for the Turkey Cove property indicates that it was signed by the Magistrate at 7:45 p. m. The evidence is clear that the officers entered the premises at approximately 7:30 p.m., about 15 minutes before the warrant issued.

stitutional validity of his arrest and any statements he made. *Id.* Moreover, since no defendant has established that he was the owner of or had any proprietary interest in the SUNSHINE or the three vehicles on the premises, no defendant has standing to challenge their seizure.[18]

### 1. *The Entry and Search*

It cannot be doubted that the facts and circumstances of which the officers were aware, recited above, provided ample probable cause to justify the entry on and search of the Turkey Cove premises, the seizure of the vessel and vehicles found there, and the arrests of the four defendants on the property.

In this Circuit, the ultimate test for determining whether exigent circumstances exist justifying a warrantless entry "is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *United States v. Adams,* 621 F.2d 41, 44 (1st Cir. 1980). It is plain that a compelling necessity for immediate action existed in this case. At the time the decision to enter was made, the agents had substantial reason to believe that a number of coconspirators were still on the premises and might attempt to flee before Steadman arrived with the search warrant. *See id.* at 44 n.6. Cunniff had just stopped the Georgia Jeep as it left the driveway carrying Case and Hubbard. Case and Hubbard had a CB radio in the Jeep with which they could have alerted other defendants on the property. Similarly, only two hours earlier, Cunniff had learned from Drinan that Hensel had instructed his Boston attorney to inform a lawyer in Philadelphia of his arrest and had told the Boston attorney that the Philadelphia lawyer would know what to do. The drivers of vehicles connected with the property, who had originally checked into the Lewiston Ramada Inn and had planned to stay until June 3, had already departed. News coverage of Hensel's arrest made it even more probable that word of the seizure of the PATRICIA had reached the conspirators at Turkey Cove. The Turkey Cove property provided numerous avenues of escape through the woods or over the water. These facts amply justified Cunniff's fear that the defendants at Turkey Cove had discovered the surveillance and might destroy evidence or flee before the search warrant issued. They clearly establish "such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *Id.* at 44. *See also United States v. Edwards,* 602 F.2d 458, 469 (1st Cir. 1979); *United States v. Kulcsar,* 586 F.2d 1283 (8th Cir. 1978); *United States v. Campbell,* 581 F.2d 22 (2d Cir. 1978); *United States v. Flickinger,* 573 F.2d 1349 (9th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978); *Dorman v. United States,* 435 F.2d 385 (U.S.App.D.C.1970). Exigent circumstances required the agents' entry onto the property to preserve the status quo until the warrant arrived. *See Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782 (1967).

### 2. *The Arrests and Seizures*

The arrests of the four defendants found on the premises, and the seizure of the SUNSHINE and the three vehicles found there, were also completely lawful as based on probable cause. Clearly, the presence of the defendants on the property, in light of all the information available to the officers regarding the drug conspiracy, *see United States v. Clark,* 559 F.2d 420, 424 (5th Cir.), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977), was "sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). No arrest warrants were required. *United States v. Watson, supra* 423 U.S. at 423–24, 96 S.Ct. at 827; *Gerstein v. Pugh,* 420 U.S. 103, 113–14, 95 S.Ct. 854, 862, 43 L.Ed.2d 54 (1975).

Probable cause being present, the seizure of the SUNSHINE and the three vehicles was authorized by 21 U.S.C. § 881(a)(4),

---

18. *See* note 20, *infra.*

(b)(4). *See United States v. Pappas*, 613 F.2d 324, 326–30 (1st Cir. 1979); *United States v. Johnson*, 572 F.2d 227, 234 (9th Cir.), *cert. denied*, 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1137 (1978). *See also United States v. One 1972 Chevrolet Nova*, 560 F.2d 464, 469–70 (1st Cir. 1977); *United States v. Balsamo*, 468 F.Supp. 1363, 1381 (D.Me.1979). The vessel and the vehicles were not searched at that time. Rather, they were secured in anticipation of warrants being obtained.

No Fourth Amendment right of any defendant was violated by the officers' entry on and search of Lot # 3, the seizure of the vessel and vehicles found there, or the arrests of defendants Storey, Standley, Duke and Downing.

E. *Defendant Downing's Statement to Customs Officer Flaherty—The Discovery and Search of His Cessna Airplane*

Defendant Downing seeks to bar from evidence, on *Miranda* principles, the statement he made to Customs Officer Flaherty regarding his ownership of the Cessna airplane located at Owl's Head Airport.

At the time the statement was made, Downing was under arrest. He had been given his *Miranda* warnings by Sgt. Bailey while still in the main house. When Downing invoked his right to counsel, Bailey ceased his questioning. Shortly thereafter, Downing was removed to the cookhouse for processing. Customs Officer Flaherty undertook the processing of Downing and reminded him that no questions need be answered. At Flaherty's request Downing emptied his pockets, removing some keys. Flaherty inquired about the keys. Downing's statement that the keys were to a Cessna airplane owned by him and located at the Owl's Head Airport was in response to Flaherty's question.

The standard set forth in *Miranda* is clear: "If the individual states that he wants an attorney, the interrogation must

cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." *Miranda v. Arizona, supra* 384 U.S. at 474, 86 S.Ct. at 1628. Because Downing had requested a lawyer, and the statement he made was in response to a question asked when no lawyer was present, his reply to Flaherty's question cannot be used against him at trial. *Id.* at 473–74, 86 S.Ct. at 1627.

As a result of Downing's statement to Flaherty, Cunniff and Bailey went to the Owl's Head Airport and impounded the Cessna airplane. The plane was then flown to Augusta, where it was searched pursuant to a warrant. Downing contends that any evidence obtained by virtue of the seizure and search of the aircraft is tainted and must be suppressed.

The Supreme Court has not applied the "tainted fruit of the poisonous tree" doctrine of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), to indirect, nontestimonial evidence resulting from a defendant's incriminating statements obtained in violation of *Miranda*. *See United States v. Massey*, 437 F.Supp. 843, 856–57 (M.D.Fla.1977), *rev'd on other grounds*, 550 F.2d 300 (5th Cir. 1977). This Court is persuaded, however, that if the sanction of *Miranda* is to be so limited, the Supreme Court is the appropriate forum to make that determination. *See Fare v. Michael C.*, 439 U.S. 1310, 1314–15, 99 S.Ct. 3, 5, 58 L.Ed.2d 19 (1978).

Downing's statement to Customs Officer Flaherty, together with any evidence obtained by the officers as a result of the discovery and search of the Cessna airplane, is inadmissible as against that defendant at trial.[19]

F. *The Warrant Searches*

The warrant to search Lot # 3 and the buildings thereon was issued by the United

---

**19.** Downing's response and the evidence resulting therefrom are, however, admissible against the other defendants, *see* note 16, *supra*.

States Magistrate at 7:45 p. m. on June 3. It was supported by an affidavit of DEA Agent Steadman. Citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), defendants contend that Steadman's affidavit contained intentionally false statements and material omissions which "vitiated [the Magistrate's] finding of probable cause and worked a fraud upon the judicial system," thereby violating defendants' Fourth Amendment rights.[20] The Court rejects this argument, which borders on the specious.

In order to attack a search warrant under *Franks*, a defendant must make a substantial showing that a misstatement or omission in a supporting affidavit was necessary for the finding of probable cause, and was either knowingly or intentionally false or made in reckless disregard of the truth. *Id.* 438 U.S. at 155–56, 98 S.Ct. at 2676; *United States v. Cruz*, 594 F.2d 268, 271 (1st Cir.), *cert. denied*, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979). It is suffi-

cient to observe that no such showing has been made here.

## III

## ORDER

So much of defendants' motion to suppress as seeks to suppress the use against defendant Case of the statement made by him to DEA Agent Cunniff is GRANTED. So much of defendants' motion to suppress as seeks to suppress the use against defendant Downing of the statement made by him to Customs Officer Flaherty, together with the fruits of such statement, is GRANTED. In all other respects, defendants' motion for suppression of evidence is DENIED.

IT IS SO ORDERED.

**20.** In addition to the search warrant for the Turkey Cove property, 13 other search warrants issued in this case for five pieces of luggage, the garbage bags, five vehicles, the vessel SUNSHINE, and the Cessna airplane. Except for the above attack upon Steadman's supporting affidavit for the Turkey Cove warrant, defendants have asserted no challenge to any of the warrants or to the manner of their execution. Indeed, there can be no question that the warrants were supported by an ample showing of probable cause, *see United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965); *Aguilar v. Texas*, 378 U.S. 108, 114–15, 84 S.Ct. 1509, 1513, 12 L.Ed.2d 723 (1964); that they described with sufficient particularity the premises to be searched and the items to be seized, *see Montilla Records of Puerto Rico, Inc. v. Morales*, 575 F.2d 324, 326 (1st Cir. 1978); *United States v. Klein*, 565 F.2d 183, 189 (1st Cir. 1977), and that they were properly executed, *see Harris v. United States*, 331 U.S. 145, 153–54, 67 S.Ct. 1098, 1102, 91 L.Ed. 1399 (1947); *Gurleski v. United States*, 405 F.2d 253, 256–60 (5th Cir. 1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2127, 23 L.Ed.2d 765 (1969).

In any event, not all the defendants have standing to challenge each of the warrant searches. The government concedes that Downing owned the Cessna airplane, Standley owned the orange leather travel bag found in a garbage bag, Duke owned the tan canvas suitcase found in another garbage bag, and Case owned the brown Samsonite briefcase found in the Jeep, and that each of these defendants had standing to challenge the search of the item owned by him. But since no defendant claimed ownership of the other luggage or garbage bags found in the Jeep, none can challenge those searches. *See Rakas v. Illinois, supra* 439 U.S. at 130–31 n.1, 99 S.Ct. at 423 n.1. Nor did any defendant show that he had cognizable interest in the SUNSHINE, the three vehicles found at Turkey Cove, or the van abandoned at the Lewiston Ramada Inn. Duke claimed to own the SUNSHINE, which had been purchased by Dill in the name of Hubbard, but neither Duke nor any other defendant came forward with proof of ownership. No one asserted ownership of the 1980 Toyota Celica and the Court rejects Duke's self-serving and undocumented testimony that he owned the three vans, all of which were registered to other persons.